DU PONT et al. v. DU PONT et al.

(District Court, D. Delaware. March 19, 1918.)

No. 340.

1. CORPORATIONS ⬤➞376—ACQUISITION OF STOCK—DETERMINATION.

Though stock of a manufacturing corporation was bought of a stockholders by officers thereof under such conditions that it has the right to take over the trade, whether it shall do so is a question of business policy, to be determined by it through its directors or stockholders, and not by the court, though because of dividends since the purchase it can do so without any payment of money.

2. CORPORATIONS ⬤➞197—STOCKHOLDERS' MEETING—RIGHT TO VOTE—PERSONAL INTEREST.

Stockholders, though interested in not having the corporation exercise its right of taking over a purchase by them from another of stock in it, made while they were its officers, may vote at a stockholders' meeting to determine whether it shall do so.

3. CORPORATIONS ⬤➞201—STOCKHOLDERS' MEETING—MOTIVES IN VOTE—INQUIRY BY COURT.

The court cannot inquire into the motives of stockholders in voting against exercise by the corporation of its right to take over a purchase of its stock made by other stockholders from another, as having been influenced by the purchasing stockholders.

4. CORPORATIONS ⬤➞201—STOCKHOLDERS' MEETING—GROUND FOR AVOIDING ACTION—MISUSE OF DECREE.

Improper use of court's opinion and decree, while it might have been restrained, cannot be urged as ground for avoiding action of stockholders at meeting under interlocutory decree, having been known of before meeting, but not then brought to court's attention.

In Equity. Suit by Philip F. Du Pont and others against Pierre S. Du Pont and others. Heard on various motions and exceptions. Or-

der vacated, petition struck off, exceptions overruled, and bill dismissed.

See, also, 246 Fed. 332.

John G. Johnson, William A. Glasgow, Jr., Henry P. Brown, Frank P. Pritchard, all of Philadelphia, Pa., and Robert Penington, of Wilmington, Del., for plaintiffs.

George S. Graham and George Wharton Pepper, both of Philadelphia, Pa., William H. Button, of New York City, and John P. Laffey and William S. Hilles, both of Wilmington, Del., for defendants.

THOMPSON, District Judge.   Under the interlocutory decree of August 17, 1917, a special master was appointed to conduct a special meeting of the stockholders of the E. I. Du Pont De Nemours & Co. for the purpose of determining by their votes whether the company should avail itself of the opportunity to acquire the stock purchased by Pierre S. Du Pont and his associates from T. Coleman Du Pont, together with the proceeds thereof and dividends and income thereon. The question was to be submitted to the stockholders in the form of an affirmative resolution that the company exercise its right to acquire the stock.

On November 7, 1917, the special master filed his report, showing, inter alia, that the result of the special meeting was "that there had been 157,959 shares of stock cast 'for' the resolution, and 312,587 shares 'against' the resolution, and that, the resolution not having received a majority of the votes cast, the same had been lost." The result of the failure to carry the resolution was that the stockholders whose votes were cast at the meeting rejected for the company the opportunity for the acquisition of the stock with its increment.

On November 8th the petition of Pierre S. Du Pont was filed, praying for an order and decree dismissing the bill.   On November 14, 1917, the complainants filed a petition, praying that, notwithstanding the result of the stockholders' meeting, a decree be entered in their favor, ordering that the stock and its proceeds, dividends and interest, subject to an accounting, be turned over to the E. I. Du Pont De Nemours & Co.

On November 15th the complainants filed exceptions to the report of the special master, and on November 19th filed an answer to Pierre S. Du Pont's petition to dismiss the bill.   On December 6th, on the order of the defendants' solicitors, the case was set down for hearing upon the complainants' exceptions to the master's report.   On December 11th, on the complainants' application, an order was entered upon the defendants to file, within 20 days, an answer to the complainants' petition of November 14th.   On December 27th the defendants moved to vacate the order requiring them to file an answer and to strike off the complainants' petition of November 14th.

On January 12th hearing was had upon the defendants' motion to vacate the order requiring them to answer and to strike off the complainants' petition, upon the complainants' exceptions to the master's report, and upon the defendants' petition to dismiss the bill.   The primary question to be determined is whether the facts set out in the

complainants' petition are sufficient to require an answer by the defendants. If so, it must be because the allegations of the petition, if taken as true, would require the entry of a decree in favor of the complainants. This would be in effect the vacating of the interlocutory decree directing the determination of the question whether the company should acquire the stock by a vote of the stockholders, and a reversal of the decision in the former opinions of the court that the question was one of business policy for the corporation to decide in view of the facts of the case.

The petition sets out certain facts of which evidence was before the court before the interlocutory decree was entered. They relate to a resolution of the board of directors of December 8, 1915, directing the officers of the company to assist in the defense of the suit; the action of Pierre S. Du Pont, as president of the company, on January 8, 1916, in recommending the removal of Alfred I. Du Pont from office as vice president and member of the finance committee; the action of the board of directors on January 10, 1916, in removing Alfred I. Du Pont; the action at the stockholders' meeting on March 13, 1916, in passing a resolution undertaking to condone the action of Pierre S. Du Pont and his associates in the purchase of the stock; the defeat of Alfred I. Du Pont, William Du Pont, and Francis I. Du Pont for re-election to the board of directors.

The petition contains further allegations, through domination and control by the defendants of all the officers of the company, board of directors, finance committee, and executive committee, of the establishing of a publicity bureau in charge of paid employés of the company and its use to disseminate in the press reports, suggestions, and arguments favorable to the retention by the defendants of the profits upon the purchase of the stock, and, after the entry of the decree, reports, suggestions, and arguments calculated to make the stockholders believe that the decision of the court was erroneous, and that the defendants would resign or the management be changed, and results disastrous to the company ensue, if the defendants were forced to relinquish the stock.

It is further alleged that the board of directors, through the domination of the defendants, on October 25, 1916, amended the bonus plan of the company under which stock was purchased by the company for the reward of faithful employés, so as to confer upon the holders of bonus stock, amounting to 26,148 shares, the right to vote, although the stock had not yet been paid for in full. It is alleged the defendants have and exercised domination and control over the holders of the shares of bonus stock so held, resulting in its being almost entirely voted against the resolution. It is alleged that after the date of the decree, and before the stockholders' meeting conducted by the special master, the defendants procured officers and employés of the company as the company's representatives to visit stockholders and induce them to vote against the acquisition of the stock by the company; that through their control of the company they caused the heads of departments, superintendents of plants, and other influential officials to influence the employés in their various departments or under their com-

trol to vote against the resolution, and, as the result thereof, 1,129 officers and employés of the company, holding 138,683 shares, voted at the meeting, and all except 3, holding 452 shares, voted against the resolution.

It is alleged that the defendants induced stockholders to vote against the resolution by suggesting or stating that, if the company required the defendants to account to it, they would resign their positions with the company; that large blocks of their stock might be put upon the market, and thus a greater loss might accrue to the company than would be compensated for by the profits, which defendants might be required to pay to the company. It is further alleged that, after the decree and before the meeting, the defendants induced stockholders to vote against the resolution by showing to the larger stockholders what was claimed to be the opinion of eminent New York counsel, a former Justice of the Supreme Court of the United States, given to the defendants, to the effect that the decision of this court that the stock of T. Coleman Du Pont had been obtained by the defendants in fraud of the rights of the company was erroneous.

It is alleged that on August 30, 1917, after the decree was entered, a letter was addressed to the stockholders, signed by H. M. Barksdale, J. A. Haskell, and C. L. Patterson, directors and vice presidents of the company, urging the stockholders to vote against the resolution and soliciting their proxies. The letter set out at length opinions of the writers and arguments to the effect that it would be unwise for the company to acquire the stock. It stated that Coleman Du Pont had never offered to sell to the company more than 20,700 shares of common stock, and that solely for the purpose of resale at cost to important employés of the company. It stated that, when Coleman Du Pont's offer came before the finance committee, Pierre S. Du Pont urged its acceptance, but it was declined, because the members of the finance committee considered the price too high, and about one month later the offer was withdrawn, and that subsequently Pierre S. Du Pont purchased the whole amount of T. Coleman Du Pont's stock. The letter stated the increase of value of the stock between the time of its purchase up to the following December, when the suit was brought; the important connection in the company's management of the defendants; the vast increase in the capacity and output of the company; and it concluded with the explanation that the statements in the letter were "in order that stockholders may realize the lack of wisdom and foresight involved in voting in favor of a proposition that has, we believe, for its primary purpose a great weakening of, and if possible a change in, the present control and management."

The complainants in their petition contend that certain stockholders' votes should not have been received for the purpose of enabling the defendants to withhold from the corporation the stock and its profits. The stock which it is urged should not have been counted against the resolution consisted of (1) 96,171 shares owned by and voted by the defendants; (2) 63,312 other shares voted by officers and employés not defendants, but who held as part of their shares of stock the bonus stock above referred to amounting to 26,148 shares; (3) 7,452 shares

voted by stockholders who were wives, sisters, brothers, children, or mothers of defendants; (4) 8,805 shares voted by stockholders who were brothers-in-law, sisters-in-law, or fathers-in-law of defendants; (5) 8,932 shares voted by wives and mothers of officers and employés holding bonus stock; (6) 6,360 shares voted by sisters-in-law and brothers-in-law of officers and employés holding bonus stock; (7) 3,060 shares held by officers and employés who had no bonus stock; (8) 32,051 other shares voted by directors of the company, who are not employés; (9) 9,865 shares voted by stockholders closely identified with the company, including 1,807 shares which had been given to William G. Ramsay, now deceased, by Pierre S. Du Pont and others, and including also 7,746 shares voted by Alexis I. Du Pont and Eugene Du Pont as trustees for Amelia E. Du Pont, Julia S. Du Pont, and Annie Du Pont Peyton. They contend that 17,116 shares voted by Francis I. Du Pont and Ernest Du Pont, as two of three trustees for the estate of Francis G. Du Pont, and which the special master included in computing the vote cast at the meeting in the 157,959 shares voted for the resolution, but reported that the ballot should not have been counted, because the third trustee, A. Felix Du Pont, refused to vote with them, should be counted in favor of the resolution.

It is alleged in the petition that, because the court found "that it is a foregone conclusion that its acquisition would be of enormous profit to the company," there is no reasonable and fair explanation of the voting of the above classes of stock against requiring the defendants to account, other than that the stockholders voting said stock were under the direct domination and control of the defendants, or that the voting of the stock was to subserve some interest or purpose outside of and regardless of the consequences to the company and inconsistent with its interests.

Two propositions are presented on behalf of the complainants, upon either of which their counsel contend they are entitled to a decree in their favor:

First. Inasmuch as the record shows that the defendants had, prior to the entry of the interlocutory decree, received in dividends, interest, and proceeds from the sale of bonds received as dividends, sums more than sufficient to reimburse them for their outlay in the purchase of the stock from T. Coleman Du Pont, and therefore the company could acquire the stock without the payment of any money out of its treasury, there was at the time of the stockholders' meeting no question of business policy for the determination of the corporation through its stockholders; that the question before the stockholders' meeting, therefore, was no longer whether the company should acquire the stock, but the "opportunity" to make profit by the purchase of stock, which belonged in equity to the corporation, having been consummated and turned into actual profits, the defendants, as trustees ex maleficio, are bound to restore the trust estate, not the "opportunity" which has passed, but the profits which it has produced.

Second. That the votes of the defendants because of their interest, and, in view of the allegations of domination and control by the defendants over the corporation, its board of directors, its officers and

employés, and their use of their domination and control in obtaining through the influence exerted by officials of the company over stockholders and through the alleged improper impressions concerning the opinion and decree of the court given by those officials to the stockholders, the votes of the directors, officers, and employés, of their relatives by blood and marriage, and of the stockholders who voted against the resolution cannot avail, to the prejudice of the minority stockholders, to reject the opportunity to take the profits.

[1] It is not now for the first time brought to the attention of the court that the profits in dividends upon the stock and the proceeds of sales of bonds were more than sufficient to repay the defendants what they paid Coleman Du Pont, with interest, and therefore no payment of money out of the treasury of the company was required if the company should determine to acquire the stock. It is a situation which existed and was considered by the court prior to entering the interlocutory decree and is in effect set out in the decree. It was a fact which the special master was directed to present to the stockholders for their information in the form of notice set out in the decree. The paragraph in the notice to the stockholders is as follows:

"For the information of the stockholders, it is proper to state that, from the statements filed in this cause by the defendants, it appears that. if the stockholders desire to exercise the right to acquire said stock, and to require the defendants to account for the excess in cash, and the Anglo-French bonds not converted into cash, received by them as aforesaid, it will not be necessary for the company to pay anything to the defendants, for they have been repaid in cash more than the amount paid by them, with interest, for said stock purchased from T. Coleman Du Pont."

The fact was urged prior to the entry of the interlocutory decree as a reason why a decree should be entered for the complainants, without referring the question to the stockholders' meeting, upon the ground that a question of business policy no longer existed. It may be desirable to restate some of the circumstances surrounding the purchase of the stock in their application to the rights of the company. The Powder Company was not engaged in buying and selling its own stock. It had under its charter the right, through its board of directors, to purchase its own stock, and it had, at the time when Pierre S. Du Pont purchased the stock, sufficient available funds to pay for it. So far as the evidence shows, however, the only transaction involving the purchase of its own stock, which had ever come before the finance committee or the board of directors, with the exception of small purchases for bonus purposes, was in relation to the purchase of the 20,700 shares from T. Coleman Du Pont for the purpose of distributing it among employés at cost. If T. Coleman Du Pont had never made the offer, or if the offer had been finally rejected, Pierre S. Du Pont would have had the right to purchase all of Coleman's shares of stock, or those of any other stockholder, in whatever amount and at whatever price he saw fit, and the company could not have claimed the right to take the stock from him, or to make him accountable for profits upon it. The offer of Coleman Du Pont and the negotiations committed to Pierre S. Du Pont had no purpose of profit to the company through increase in value, and no

other purpose excepting obtaining the stock for distribution among the more important employés of the company. The company had never had under consideration the purchase of more than the 20,700 shares, nor a price per share in excess of $160.

If Pierre S. Du Pont and his associates had taken for themselves, while acting as officers and directors of the company, a contract with a foreign government for the manufacture and sale of a large quantity of explosives, that contract, being of the same character and with the same parties as the contracts carried on in the ordinary business of the company, without any necessity for action by the board of directors or the stockholders, would probably have been held in equity an asset of the company, and a minority stockholder would have been entitled to a decree for the transfer of the contract to the company, or, in case the contract had been carried out, for an accounting of the profits for the benefit of the company. Unless special circumstances existed, such as the inability of the company to carry out such a contract because of inadequate capital, inadequacy of plant, or some such reason, no question of business policy would have required a vote of the board of directors or stockholders, and no vote of directors interested in preventing the company obtaining the contract, and no vote of the majority stockholders would have been permitted to interfere with the right of the minority in that asset of the company.

The acquisition of this large block of stock, without any definite purpose as to its disposition, would have been an innovation in the business policy of the company, and other questions are involved than that of the immediate enrichment of the corporation's treasury and the probable immediate increase in the value of the holdings of the individual stockholders. An individual stockholder, whose only interest was the ultimate value of his stock as a dividend-paying investment, might well have paused to consider, at the time the purchase was made in March, 1915, whether it would be a wise policy for the company, in the circumstances that then existed, to invest its funds in such a large number of its own shares, without any definite purpose as to their future disposition; and in August, 1917, when it had appeared that the company could acquire the stock without paying any money out of its treasury, he might reasonably consider various phases of that same question. He might as a matter of policy reasonably desire that the control in the management under which he had during the continuance of the war seen an immense growth in the business of the company and large profits in the shape of dividends paid to the stockholders be made more firm by permitting the stock to remain in the hands of the defendants. The court cannot say that the business success of the corporation is merely a result of war conditions, and that the management of the company's affairs by the individual defendants in their official capacity is a fortuitous circumstance, disassociated with the causes of the company's success. The stockholder may well have considered that the management contributed to or caused the company's success. The stockholder might reasonably consider questions of business policy relating to the disposition of the stock which would arise after its acquisition. Should it

be held for a rise in value and sold at a profit? Should it be distributed at cost to heads of departments and employés under the bonus plan? Should it be held in the treasury, and the dividends earned distributed to the remaining stockholders? Or should it be retired, reducing the outstanding capital of the company? The increase or decrease of the capital stock of corporations is the subject of statutory regulation under the laws of most of the states, and, under the laws of Delaware and of New Jersey, is dependent upon the decision of the stockholders at a meeting duly called for the purpose after favorable action by the board of directors. It is essentially a question of corporate business policy; and the power to purchase its own stock is conferred upon the board of directors by the charters of both E. I. Du Pont & Co. and the E. I. Du Pont Powder Company. As the question of acquisition of the stock involves other considerations than taking it, together with the profits, without the payment of any money out of the treasury of the company, which raise questions of business policy, I see no reason to depart from the conclusions upon which the interlocutory decree was based.

[2] Passing to the complainants' second proposition, the first question presented is: To what extent the individual defendants were affected in their right to vote by their interest in retaining the stock, and, assuming, as we must, the truth of the allegations in the complainants' petition for the purpose of determining whether the defendants should be required to answer, what effect has the domination and control of the individual defendants over the corporation and its officers and employés and the alleged improper use of the opinion of the court upon the validity of the result of the vote at the stockholders' meeting?

The general rule is that a stockholder is not deprived of the right to vote upon a question in which he has an individual interest in the result of the vote apart from his general interest in the corporation. His relation as a stockholder to other individual stockholders and to the body of stockholders is not a fiduciary one. Consequently, when he is called upon to decide at a stockholders' meeting between his own interest as an individual and what may be his interest along with other stockholders in benefiting the corporation, he is free to exercise his own judgment, and to act in accordance with selfish rather than altruistic motives; and further, even though the question for determination by the stockholders be one raised by his acts in his own interest, while an officer or director of the corporation, he is not, as a stockholder, debarred from the full use of the property in his stock, including the right to vote that stock. An exception to that rule would apply in a case where, as a director of the corporation, he had misappropriated an asset of the company to which he was accountable to the corporation, as in the case of Cook v. Deeks, relied upon by counsel for the complainants and reported in the Law Reports, Appeal Cases, part 3, April 1, 1916, page 554. Officers appropriating an asset in equity belonging to the company—in that case a contract for the sort of work in which the corporation was actually engaged and for the performance of which it had been incorporated—could not, through their control of the majority of the stock at a meeting

called by themselves for that purpose, validly use their voting power to vest it in themselves. There was no question of business policy to be determined by the corporation in that case.

Where, as in the present case, a question of business policy is to be determined by the proper corporate authority, the court cannot deprive one who is interested adversely to the alleged interests of the corporation and other stockholders from exercising his right to vote his stock. Neither can the court, because of its power to prevent a majority depriving the minority of its rights to the benefit of a profitable asset, which in equity belongs to the corporation, usurp the power belonging to the individual stockholders by forcing upon the corporation its decisions in a question of corporate management, because that question of corporate management is coupled with the misuse of a fiduciary relation in the same transaction. In March, 1915, Pierre S. Du Pont and his associates as stockholders would have had an equal right with the complainants to vote in determining as a matter of corporate policy at a stockholders' meeting duly called upon full notice to all the stockholders of all the facts in relation to the transaction whether the company should purchase Coleman Du Pont's holdings of stock. The distinction between the situation as it then existed and as it now exists is that at that time, although the purchase had been consummated, one of the questions of policy to be determined would have been whether the company should pay money out of its treasury to acquire the benefits of a transaction which, while it then had all the appearance of being a profitable one, still had an element of uncertainty in the future value of the stock. Other questions of business policy present at that time and still remaining open have been discussed. The rights of the defendants as stockholders are no less now because of the circumstance that the transaction has ripened into a profitable one.

[3, 4] The question of influence exerted upon other stockholders through the domination and control of the defendants to vote against the resolution and the question of the effect upon stockholders of the letter sent to them by Messrs. Barksdale, Haskell, and Patterson would involve an inquiry by the court into the motives which actuated each stockholder in depositing his vote which it is beyond the power or policy of the courts to pursue. Every stockholder was fully informed of the decree of the court by the special master and of the questions involved. He had a right to give his proxy to whomsoever he desired, and his motives for voting, can no more be inquired into now than they could prior to the stockholders' meeting. It must be assumed that every stockholder was reasonably capable of deciding questions of business policy for himself, and if the court could not have determined that for him in advance, it cannot determine it for him now. Assuming, without so finding, that the letter of Messrs. Barksdale, Haskell, and Patterson involved an improper use of the opinion and decree of the court for which the defendants were legally responsible, and while the court might have prevented such improper use by the defendants, as in the case of Rollman Mfg. Co. v. Universal Hardware Works, 238 Fed. 568, 151 C. C. A. 504, the complainants

had full opportunity to bring the matter to the attention of the court prior to the meeting. Not having done so they cannot now set up that act as a ground for setting aside the action of the stockholders at the meeting. For all that appears in the petition, these facts were as fully known to them at that time as at the present.

It is not necessary to decide whether the holders of the bonus stock were entitled to vote that stock, as the determination of that question would not affect the result of the ballot at the stockholders' meeting. In accordance with the foregoing views, it is concluded that the complainants' petition of November 14, 1917, does not set up any sufficient grounds for setting aside the interlocutory decree, nor for entering a decree in favor of the complainants.

The questions raised by the complainants' exceptions to the report of the special master, excepting the first, tenth, eleventh, and twelfth exceptions, are fully covered by the conclusions reached concerning the matters set out in the complainants' petition. The first exception to the master's report must be dismissed, as the special master was acting under the authority of the interlocutory decree, and, if there was error in ordering the stockholders' meeting, it was not the error of the master. The conclusions of the master in relation to the votes cast by various fiduciaries, to which the tenth, eleventh, and twelfth exceptions apply, have been carefully examined. The special master's conclusions are, in the opinion of the court, correct.

An order will be entered, vacating the order of December 11, 1917, upon the defendants, requiring them to answer the complainants' petition of November 14, 1917, striking off the said petition, and overruling the complainants' exceptions to the special master's report and confirming said report.

A decree will be entered, dismissing the bill, with costs to the defendants.