**UNOCAL CORPORATION, a Delaware corporation, Defendant Below, Appellant,**

v.

**MESA PETROLEUM CO., a Delaware corporation, Mesa Asset Co., a Delaware corporation, Mesa Eastern, Inc., a Delaware corporation and Mesa Partners II, a Texas partnership, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.
Submitted: May 16, 1985.
Oral Decision: May 17, 1985.
Written Decision: June 10, 1985.

</div>

A. Gilchrist Sparks, III (argued), and Kenneth J. Nachbar of Morris, Nichols, Arsht & Tunnell, Wilmington, James R. Martin and Mitchell A. Karlan of Gibson, Dunn & Crutcher and Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., of counsel, for appellant.

Charles F. Richards, Jr. (argued), Samuel A. Nolen, and Gregory P. Williams of Richards, Layton & Finger, Wilmington, for appellees.

Before McNEILLY and MOORE, JJ., and TAYLOR, Judge (Sitting by designation pursuant to Del. Const., Art. 4, § 12.)

MOORE, Justice.

We confront an issue of first impression in Delaware—the validity of a corporation's self-tender for its own shares which excludes from participation a stockholder making a hostile tender offer for the company's stock.

The Court of Chancery granted a preliminary injunction to the plaintiffs, Mesa Petroleum Co., Mesa Asset Co., Mesa Partners II, and Mesa Eastern, Inc. (collectively "Mesa")[1], enjoining an exchange offer of the defendant, Unocal Corporation (Unocal) for its own stock. The trial court concluded that a selective exchange offer, excluding Mesa, was legally impermissible. We cannot agree with such a blanket rule. The factual findings of the Vice Chancellor, fully supported by the record, establish that Unocal's board, consisting of a majori-

ty of independent directors, acted in good faith, and after reasonable investigation found that Mesa's tender offer was both inadequate and coercive. Under the circumstances the board had both the power and duty to oppose a bid it perceived to be harmful to the corporate enterprise. On this record we are satisfied that the device Unocal adopted is reasonable in relation to the threat posed, and that the board acted in the proper exercise of sound business judgment. We will not substitute our views for those of the board if the latter's decision can be "attributed to any rational business purpose." *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971). Accordingly, we reverse the decision of the Court of Chancery and order the preliminary injunction vacated.[2]

I.

The factual background of this matter b***rs a significant relationship to its ulti-***** outcome.

On April 8, 1985, Mesa, the owner of approximately 13% of Unocal's stock, commenced a two-tier "front loaded" cash tender offer for 64 million shares, or approximately 37%, of Unocal's outstanding stock at a price of $54 per share. The "back-end" was designed to eliminate the remaining publicly held shares by an exchange of securities purportedly worth $54 per share. However, pursuant to an order entered by the United States District Court for the Central District of California on April 26, 1985, Mesa issued a supplemental proxy statement to Unocal's stockholders disclosing that the securities offered in the second-step merger would be highly subordinated, and that Unocal's capitalization would differ significantly from its present

---

1. T. Boone Pickens, Jr., is President and Chairman of the Board of Mesa Petroleum and President of Mesa Asset and controls the related Mesa entities.

2. This appeal was heard on an expedited basis in light of the pending Mesa tender offer and

Unocal exchange offer. We announced our decision to reverse in an oral ruling in open court on May 17, 1985 with the further statement that this opinion would follow shortly thereafter. *See infra* n. 5.

structure. Unocal has rather aptly termed such securities "junk bonds".[3]

Unocal's board consists of eight independent outside directors and six insiders. It met on April 13, 1985, to consider the Mesa tender offer. Thirteen directors were present, and the meeting lasted nine and one-half hours. The directors were given no agenda or written materials prior to the session. However, detailed presentations were made by legal counsel regarding the board's obligations under both Delaware corporate law and the federal securities laws. The board then received a presentation from Peter Sachs on behalf of Goldman Sachs & Co. (Goldman Sachs) and Dillon, Read & Co. (Dillon Read) discussing the bases for their opinions that the Mesa proposal was wholly inadequate. Mr. Sachs opined that the minimum cash value that could be expected from a sale or orderly liquidation for 100% of Unocal's stock was in excess of $60 per share. In making his presentation, Mr. Sachs showed slides outlining the valuation techniques used by the financial advisors, and others, depicting recent business combinations in the oil and gas industry. The Court of Chancery found that the Sachs presentation was designed to apprise the directors of the scope of the analyses performed rather than the facts and numbers used in reaching the conclusion that Mesa's tender offer price was inadequate.

Mr. Sachs also presented various defensive strategies available to the board if it concluded that Mesa's two-step tender offer was inadequate and should be opposed. One of the devices outlined was a self-tender by Unocal for its own stock with a reasonable price range of $70 to $75 per share. The cost of such a proposal would cause the company to incur $6.1—6.5 billion of additional debt, and a presentation was made informing the board of Unocal's ability to handle it. The directors were told that the primary effect of this obligation would be to reduce exploratory drilling, but that the company would nonetheless remain a viable entity.

The eight outside directors, comprising a clear majority of the thirteen members present, then met separately with Unocal's financial advisors and attorneys. Thereafter, they unanimously agreed to advise the board that it should reject Mesa's tender offer as inadequate, and that Unocal should pursue a self-tender to provide the stockholders with a fairly priced alternative to the Mesa proposal. The board then reconvened and unanimously adopted a resolution rejecting as grossly inadequate Mesa's tender offer. Despite the nine and one-half hour length of the meeting, no formal decision was made on the proposed defensive self-tender.

On April 15, the board met again with four of the directors present by telephone

---

**3.** Mesa's May 3, 1985 supplement to its proxy statement states:

(i) following the Offer, the Purchasers would seek to effect a merger of Unocal and Mesa Eastern or an affiliate of Mesa Eastern (the "Merger") in which the remaining Shares would be acquired for a combination of subordinated debt securities and preferred stock; (ii) the securities to be received by Unocal shareholders in the Merger would be subordinated to $2,400 million of debt securities of Mesa Eastern, indebtedness incurred to refinance up to $1,000 million of bank debt which was incurred by affiliates of Mesa Partners II to purchase Shares and to pay related interest and expenses and all then-existing debt of Unocal; (iii) the corporation surviving the Merger would be responsible for the payment of all securities of Mesa Eastern (including any such securities issued pursuant to the Merger) and the indebtedness referred to in item (ii) above, and such securities and indebtedness would be repaid out of funds generated by the operations of Unocal; (iv) the indebtedness incurred in the Offer and the Merger would result in Unocal being much more highly leveraged, and the capitalization of the corporation surviving the Merger would differ significantly from that of Unocal at present; and (v) in their analyses of cash flows provided by operations of Unocal which would be available to service and repay securities and other obligations of the corporation surviving the Merger, the Purchasers assumed that the capital expenditures and expenditures for exploration of such corporation would be significantly reduced.

and one member still absent.[4] This session lasted two hours. Unocal's Vice President of Finance and its Assistant General Counsel made a detailed presentation of the proposed terms of the exchange offer. A price range between $70 and $80 per share was considered, and ultimately the directors agreed upon $72. The board was also advised about the debt securities that would be issued, and the necessity of placing restrictive covenants upon certain corporate activities until the obligations were paid. The board's decisions were made in reliance on the advice of its investment bankers, including the terms and conditions upon which the securities were to be issued. Based upon this advice, and the board's own deliberations, the directors unanimously approved the exchange offer. Their resolution provided that if Mesa acquired 64 million shares of Unocal stock through its own offer (the Mesa Purchase Condition), Unocal would buy the remaining 49% outstanding for an exchange of debt securities having an aggregate par value of $72 per share. The board resolution also stated that the offer would be subject to other conditions that had been described to the board at the meeting, or which were deemed necessary by Unocal's officers, including the exclusion of Mesa from the proposal (the Mesa exclusion). Any such conditions were required to be in accordance with the "purport and intent" of the offer.

Unocal's exchange offer was commenced on April 17, 1985, and Mesa promptly challenged it by filing this suit in the Court of Chancery. On April 22, the Unocal board met again and was advised by Goldman Sachs and Dillon Read to waive the Mesa Purchase Condition as to 50 million shares. This recommendation was in response to a perceived concern of the shareholders that, if shares were tendered to Unocal, no shares would be purchased by either offeror. The directors were also advised that they should tender their own Unocal stock into the exchange offer as a mark of their confidence in it.

Another focus of the board was the Mesa exclusion. Legal counsel advised that under Delaware law Mesa could only be excluded for what the directors reasonably believed to be a valid corporate purpose. The directors' discussion centered on the objective of adequately compensating shareholders at the "back-end" of Mesa's proposal, which the latter would finance with "junk bonds". To include Mesa would defeat that goal, because under the proration aspect of the exchange offer (49%) every Mesa share accepted by Unocal would displace one held by another stockholder. Further, if Mesa were permitted to tender to Unocal, the latter would in effect be financing Mesa's own inadequate proposal.

On April 24, 1985 Unocal issued a supplement to the exchange offer describing the partial waiver of the Mesa Purchase Condition. On May 1, 1985, in another supplement, Unocal extended the withdrawal, proration and expiration dates of its exchange offer to May 17, 1985.

Meanwhile, on April 22, 1985, Mesa amended its complaint in this action to challenge the Mesa exclusion. A preliminary injunction hearing was scheduled for May 8, 1985. However, on April 23, 1985, Mesa moved for a temporary restraining order in response to Unocal's announcement that it was partially waiving the Mesa Purchase Condition. After expedited briefing, the Court of Chancery heard Mesa's motion on April 26.

---

4. Under Delaware law directors may participate in a board meeting by telephone. Thus, 8 *Del.C.* § 141(i) provides:

Unless otherwise restricted by the certificate of incorporation or by-laws, members of the board of directors of any corporation, or any committee designated by the board, may participate in a meeting of such board or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

On April 29, 1985, the Vice Chancellor temporarily restrained Unocal from proceeding with the exchange offer unless it included Mesa. The trial court recognized that directors could oppose, and attempt to defeat, a hostile takeover which they considered adverse to the best interests of the corporation. However, the Vice Chancellor decided that in a selective purchase of the company's stock, the corporation bears the burden of showing: (1) a valid corporate purpose, and (2) that the transaction was fair to all of the stockholders, including those excluded.

Unocal immediately sought certification of an interlocutory appeal to this Court pursuant to Supreme Court Rule 42(b). On May 1, 1985, the Vice Chancellor declined to certify the appeal on the grounds that the decision granting a temporary restraining order did not decide a legal issue of first impression, and was not a matter to which the decisions of the Court of Chancery were in conflict.

However, in an Order dated May 2, 1985, this Court ruled that the Chancery decision was clearly determinative of substantive rights of the parties, and in fact decided the main question of law before the Vice Chancellor, which was indeed a question of first impression. We therefore concluded that the temporary restraining order was an appealable decision. However, because the Court of Chancery was scheduled to hold a preliminary injunction hearing on May 8 at which there would be an enlarged record on the various issues, action on the interlocutory appeal was deferred pending an outcome of those proceedings.

In deferring action on the interlocutory appeal, we noted that on the record before us we could not determine whether the parties had articulated certain issues which the Vice Chancellor should have an opportunity to consider in the first instance. These included the following:

a) Does the directors' duty of care to the corporation extend to protecting the corporate enterprise in good faith from perceived depredations of others, including persons who may own stock in the company?

b) Have one or more of the plaintiffs, their affiliates, or persons acting in concert with them, either in dealing with Unocal or others, demonstrated a pattern of conduct sufficient to justify a reasonable inference by defendants that a principle objective of the plaintiffs is to achieve selective treatment for themselves by the repurchase of their Unocal shares at a substantial premium?

c) If so, may the directors of Unocal in the proper exercise of business judgment employ the exchange offer to protect the corporation and its shareholders from such tactics? *See Pogostin v. Rice*, Del. Supr., 480 A.2d 619 (1984).

d) If it is determined that the purpose of the exchange offer was not illegal as a matter of law, have the directors of Unocal carried their burden of showing that they acted in good faith? *See Martin v. American Potash & Chemical Corp.*, 33 Del.Ch. 234, 92 A.2d 295 at 302.

After the May 8 hearing the Vice Chancellor issued an unreported opinion on May 13, 1985 granting Mesa a preliminary injunction. Specifically, the trial court noted that "[t]he parties basically agree that the directors' duty of care extends to protecting the corporation from perceived harm whether it be from third parties or shareholders." The trial court also concluded in response to the second inquiry in the Supreme Court's May 2 order, that "[a]lthough the facts, ... do not appear to be sufficient to prove that Mesa's principle objective is to be bought off at a substantial premium, they do justify a reasonable inference to the same effect."

As to the third and fourth questions posed by this Court, the Vice Chancellor stated that they "appear to raise the more fundamental issue of whether directors owe fiduciary duties to shareholders who they perceive to be acting contrary to the best interests of the corporation as a whole." While determining that the directors' decision to oppose Mesa's tender

offer was made in a good faith belief that the Mesa proposal was inadequate, the court stated that the business judgment rule does not apply to a selective exchange offer such as this.

On May 13, 1985 the Court of Chancery certified this interlocutory appeal to us as a question of first impression, and we accepted it on May 14. The entire matter was scheduled on an expedited basis.[5]

## II.

The issues we address involve these fundamental questions: Did the Unocal board have the power and duty to oppose a takeover threat it reasonably perceived to be harmful to the corporate enterprise, and if so, is its action here entitled to the protection of the business judgment rule?

Mesa contends that the discriminatory exchange offer violates the fiduciary duties Unocal owes it. Mesa argues that because of the Mesa exclusion the business judgment rule is inapplicable, because the directors by tendering their own shares will derive a financial benefit that is not available to *all* Unocal stockholders. Thus, it is Mesa's ultimate contention that Unocal cannot establish that the exchange offer is fair to *all* shareholders, and argues that the Court of Chancery was correct in concluding that Unocal was unable to meet this burden.

Unocal answers that it does not owe a duty of "fairness" to Mesa, given the facts here. Specifically, Unocal contends that its board of directors reasonably and in good faith concluded that Mesa's $54 two-tier tender offer was coercive and inadequate, and that Mesa sought selective treatment for itself. Furthermore, Unocal argues that the board's approval of the exchange offer was made in good faith, on an informed basis, and in the exercise of due care. Under these circumstances, Unocal contends that its directors properly employed this device to protect the company and its stockholders from Mesa's harmful tactics.

## III.

We begin with the basic issue of the power of a board of directors of a Delaware corporation to adopt a defensive measure of this type. Absent such authority, all other questions are moot. Neither issues of fairness nor business judgment are pertinent without the basic underpinning of a board's legal power to act.

■ The board has a large reservoir of authority upon which to draw. Its duties and responsibilities proceed from the inherent powers conferred by 8 *Del.C.* § 141(a), respecting management of the corporation's "business and affairs".[6] Additionally, the powers here being exercised derive from 8 *Del.C.* § 160(a), conferring broad authority upon a corporation to deal in its own stock.[7] From this it is now well established that in the acquisition of its shares a

**5.** Such expedition was required by the fact that if Unocal's exchange offer was permitted to proceed, the proration date for the shares entitled to be exchanged was May 17, 1985, while Mesa's tender offer expired on May 23. After acceptance of this appeal on May 14, we received excellent briefs from the parties, heard argument on May 16 and announced our oral ruling in open court at 9:00 a.m. on May 17. *See supra* n. 2.

**6.** The general grant of power to a board of directors is conferred by 8 *Del.C.* § 141(a), which provides:
(a) The business *and affairs* of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise pro-

vided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation. (Emphasis added)

**7.** This power under 8 *Del.C.* § 160(a), with certain exceptions not pertinent here, is as follows:
(a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; ...

Delaware corporation may deal selectively with its stockholders, provided the directors have not acted out of a sole or primary purpose to entrench themselves in office. *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554 (1964); *Bennett v. Propp*, Del.Supr., 187 A.2d 405, 408 (1962); *Martin v. American Potash & Chemical Corporation*, Del.Supr., 92 A.2d 295, 302 (1952); *Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556, 568–569 (1977); *Kors v. Carey*, Del. Ch., 158 A.2d 136, 140–141 (1960).

■ Finally, the board's power to act derives from its fundamental duty and obligation to protect the corporate enterprise, which includes stockholders, from harm reasonably perceived, irrespective of its source. *See e.g. Panter v. Marshall Field & Co.*, 646 F.2d 271, 297 (7th Cir.1981); *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 704 (2d Cir.1980); *Heit v. Baird*, 567 F.2d 1157, 1161 (1st Cir.1977); *Cheff v. Mathes*, 199 A.2d at 556; *Martin v. American Potash & Chemical Corp.*, 92 A.2d at 302; *Kaplan v. Goldsamt*, 380 A.2d at 568–69; *Kors v. Carey*, 158 A.2d at 141; *Northwest Industries, Inc. v. B.F. Goodrich Co.*, 301 F.Supp. 706, 712 (M.D.Ill. 1969). Thus, we are satisfied that in the broad context of corporate governance, including issues of fundamental corporate change, a board of directors is not a passive instrumentality.[8]

■ Given the foregoing principles, we turn to the standards by which director action is to be measured. In *Pogostin v. Rice*, Del.Supr., 480 A.2d 619 (1984), we held that the business judgment rule, including the standards by which director

conduct is judged, is applicable in the context of a takeover. *Id.* at 627. The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984) (citations omitted). A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose." *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971).

■ When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders. In that respect a board's duty is no different from any other responsibility it shoulders, and its decisions should be no less entitled to the respect they otherwise would be accorded in the realm of business judgment.[9] *See also Johnson v. Trueblood*, 629 F.2d 287, 292–293 (3d Cir.1980). There are, however, certain caveats to a proper exercise of this function. Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred. This Court has long recognized that

8. Even in the traditional areas of fundamental corporate change, i.e., charter, amendments [8 *Del.C.* § 242(b)], mergers [8 *Del.C.* §§ 251(b), 252(c), 253(a), and 254(d)], sale of assets [8 *Del.C.* § 271(a)], and dissolution [8 *Del.C.* § 275(a)], director action is a prerequisite to the ultimate disposition of such matters. *See also, Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 888 (1985).

9. This is a subject of intense debate among practicing members of the bar and legal scholars. Excellent examples of these contending views are: Block & Miller, *The Responsibilities*

*and Obligations of Corporate Directors in Takeover Contests*, 11 Sec.Reg. L.J. 44 (1983); Easterbrook & Fischel, *Takeover Bids, Defensive Tactics, and Shareholders' Welfare*, 36 Bus.Law. 1733 (1981); Easterbrook & Fischel, *The Proper Role of a Target's Management In Responding to a Tender Offer*, 94 Harv.L.Rev. 1161 (1981). Herzel, Schmidt & Davis, *Why Corporate Directors Have a Right To Resist Tender Offers*, 3 Corp.L.Rev. 107 (1980); Lipton, *Takeover Bids in the Target's Boardroom*, 35 Bus.Law. 101 (1979).

We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult. *Bennett v. Propp*, Del.Supr., 187 A.2d 405, 409 (1962). In the face of this inherent conflict directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership. *Cheff v. Mathes*, 199 A.2d at 554–55. However, they satisfy that burden "by showing good faith and reasonable investigation...." *Id.* at 555. Furthermore, such proof is materially enhanced, as here, by the approval of a board comprised of a majority of outside independent directors who have acted in accordance with the foregoing standards. *See Aronson v. Lewis*, 473 A.2d at 812, 81; *Puma v. Marriott*, Del.Ch., 283 A.2d 69, 695 (1971); *Panter v. Marshall Field Co.*, 646 F.2d 271, 295 (7th Cir.1981).

### IV.

### A.

■ In the board's exercise of corporate power to forestall a takeover bid our analysis begins with the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders. *Guth v. Loft, Inc.*, Del. Supr., 5 A.2d 503, 510 (1939). As we have noted, their duty of care extends to protecting the corporation and its owners from perceived harm whether a threat originates from third parties or other shareholders.[10] But such powers are not absolute. A corporation does not have unbridled discretion to defeat any perceived threat by any Draconian means available.

■ The restriction placed upon a selective stock repurchase is that the directors may not have acted solely or primarily out of a desire to perpetuate themselves in office. *See Cheff v. Mathes*, 199 A.2d at 556; *Kors v. Carey*, 158 A.2d at 140. Of course, to this is added the further caveat that inequitable action may not be taken under the guise of law. *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437, 439 (1971). The standard of proof established in *Cheff v. Mathes* and discussed *supra* at page 16, is designed to ensure that a defensive measure to thwart or impede a takeover is indeed motivated by a good faith concern for the welfare of the corporation and its stockholders, which in all circumstances must be free of any fraud or other misconduct. *Cheff v. Mathes*, 199 A.2d at 554–55. However, this does not end the inquiry.

### B.

■ A further aspect is the element of balance. If a defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relation to the threat posed. This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Examples of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on "constituencies" other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of securities being offered in the exchange. *See* Lipton and Brownstein, *Takeover Responses and Directors' Responsibilities: An Update*, p. 7, ABA National Institute on the Dynamics of Corporate Control (December 8, 1983). While not a controlling factor, it also seems to us that a board may reasonably consider the basic stockholder

---

**10.** It has been suggested that a board's response to a takeover threat should be a passive one. Easterbrook & Fischel, *supra*, 36 Bus.Law. at 1750. However, that clearly is not the law of Delaware, and as the proponents of this rule of passivity readily concede, it has not been adopted either by courts or state legislatures. Easterbrook & Fischel, *supra*, 94 Harv.L.Rev. at 1194.

interests at stake, including those of short term speculators, whose actions may have fueled the coercive aspect of the offer at the expense of the long term investor.[11] Here, the threat posed was viewed by the Unocal board as a grossly inadequate two-tier coercive tender offer coupled with the threat of greenmail.

■ Specifically, the Unocal directors had concluded that the value of Unocal was substantially above the $54 per share offered in cash at the front end. Furthermore, they determined that the subordinated securities to be exchanged in Mesa's announced squeeze out of the remaining shareholders in the "back-end" merger were "junk bonds" worth far less than $54. It is now well recognized that such offers are a classic coercive measure designed to stampede shareholders into tendering at the first tier, even if the price is inadequate, out of fear of what they will receive at the back end of the transaction.[12] Wholly beyond the coercive aspect of an inadequate two-tier tender offer, the threat was posed by a corporate raider with a national reputation as a "greenmailer".[13]

■ In adopting the selective exchange offer, the board stated that its objective was either to defeat the inadequate Mesa offer or, should the offer still succeed, provide the 49% of its stockholders, who would otherwise be forced to accept "junk bonds", with $72 worth of senior debt. We find that both purposes are valid.

However, such efforts would have been thwarted by Mesa's participation in the exchange offer. First, if Mesa could tender its shares, Unocal would effectively be subsidizing the former's continuing effort to buy Unocal stock at $54 per share. Second, Mesa could not, by definition, fit within the class of shareholders being protected from its own coercive and inadequate tender offer.

Thus, we are satisfied that the selective exchange offer is reasonably related to the threats posed. It is consistent with the principle that "the minority stockholder shall receive the substantial equivalent in value of what he had before." *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107, 114 (1952). *See also Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 940 (1985). This concept of fairness, while stated in the merger context, is also rele-

11. There has been much debate respecting such stockholder interests. One rather impressive study indicates that the stock of over 50 percent of target companies, who resisted hostile takeovers, later traded at higher market prices than the rejected offer price, or were acquired after the tender offer was defeated by another company at a price higher than the offer price. *See* Lipton, *supra* 35 Bus.Law. at 106–109, 132–133. Moreover, an update by Kidder Peabody & Company of this study, involving the stock prices of target companies that have defeated hostile tender offers during the period from 1973 to 1982 demonstrates that in a majority of cases the target's shareholders benefited from the defeat. The stock of 81% of the targets studied has, since the tender offer, sold at prices higher than the tender offer price. When adjusted for the time value of money, the figure is 64%. *See* Lipton & Brownstein, *supra* ABA Institute at 10. The thesis being that this strongly supports application of the business judgment rule in response to takeover threats. There is, however, a rather vehement contrary view. *See* Easterbrook & Fischel, *supra* 36 Bus.Law. at 1739–1745.

12. For a discussion of the coercive nature of a two-tier tender offer see e.g. Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers*, 88 Harv.L.Rev. 297, 337 (1974); Finkelstein, *Antitakeover Protection Against Two-Tier and Partial Tender Offers: The Validity of Fair Price, Mandatory Bid, and Flip-Over Provisions Under Delaware Law*, 11 Sec.Reg. L.J. 291, 293 (1984); Lipton, *supra*, 35 Bus.Law at 113–14; Note, *Protecting Shareholders Against Partial and Two-Tiered Takeovers: The Poison Pill Preferred*, 97 Harv.L.Rev. 1964, 1966 (1984).

13. The term "greenmail" refers to the practice of buying out a takeover bidder's stock at a premium that is not available to other shareholders in order to prevent the takeover. The Chancery Court noted that "Mesa has made tremendous profits from its takeover activities although in the past few years it has not been successful in acquiring any of the target companies on an unfriendly basis." Moreover, the trial court specifically found that the actions of the Unocal board were taken in good faith to eliminate both the inadequacies of the tender offer and to forestall the payment of "greenmail".

vant in the area of tender offer law. Thus, the board's decision to offer what it determined to be the fair value of the corporation to the 49% of its shareholders, who would otherwise be forced to accept highly subordinated "junk bonds", is reasonable and consistent with the directors' duty to ensure that the minority stockholders receive equal value for their shares.

## V.

Mesa contends that it is unlawful, and the trial court agreed, for a corporation to discriminate in this fashion against one shareholder. It argues correctly that no case has ever sanctioned a device that precludes a raider from sharing in a benefit available to all other stockholders. However, as we have noted earlier, the principle of selective stock repurchases by a Delaware corporation is neither unknown nor unauthorized. *Cheff v. Mathes*, 199 A.2d at 554; *Bennett v. Propp*, 187 A.2d at 408; *Martin v. American Potash & Chemical Corporation*, 92 A.2d at 302; *Kaplan v. Goldsamt*, 380 A.2d at 568–569; *Kors v. Carey*, 158 A.2d at 140–141; 8 *Del.C.* § 160. The only difference is that heretofore the approved transaction was the payment of "greenmail" to a raider or dissident posing a threat to the corporate enterprise. All other stockholders were denied such favored treatment, and given Mesa's past history of greenmail, its claims here are rather ironic.

However, our corporate law is not static. It must grow and develop in response to, indeed in anticipation of, evolving concepts and needs. Merely because the General Corporation Law is silent as to a specific matter does not mean that it is prohibited. *See Providence and Worcester Co. v. Baker*, Del.Supr., 378 A.2d 121, 123–124 (1977). In the days when *Cheff, Bennett, Martin* and *Kors* were decided, the tender offer, while not an unknown device, was virtually unused, and little was known of such methods as two-tier "front-end" loaded offers with their coercive effects. Then, the favored attack of a raider was stock acquisi-

tion followed by a proxy contest. Various defensive tactics, which provided no benefit whatever to the raider, evolved. Thus, the use of corporate funds by management to counter a proxy battle was approved. *Hall v. Trans-Lux Daylight Picture Screen Corp.*, Del.Supr., 171 A. 226 (1934); *Hibbert v. Hollywood Park, Inc.*, Del.Supr., 457 A.2d 339 (1983). Litigation, supported by corporate funds, aimed at the raider has long been a popular device.

More recently, as the sophistication of both raiders and targets has developed, a host of other defensive measures to counter such ever mounting threats has evolved and received judicial sanction. These include defensive charter amendments and other devices bearing some rather exotic, but apt, names: Crown Jewel, White Knight, Pac Man, and Golden Parachute. Each has highly selective features, the object of which is to deter or defeat the raider.

Thus, while the exchange offer is a form of selective treatment, given the nature of the threat posed here the response is neither unlawful nor unreasonable. If the board of directors is disinterested, has acted in good faith and with due care, its decision in the absence of an abuse of discretion will be upheld as a proper exercise of business judgment.

To this Mesa responds that the board is not disinterested, because the directors are receiving a benefit from the tender of their own shares, which because of the Mesa exclusion, does not devolve upon *all* stockholders equally. *See Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). However, Mesa concedes that if the exclusion is valid, then the directors and all other stockholders share the same benefit. The answer of course is that the exclusion is valid, and the directors' participation in the exchange offer does not rise to the level of a disqualifying interest. The excellent discussion in *Johnson v. Trueblood*, 629 F.2d at 292–293, of the use of the business judgment rule in takeover contests also seems pertinent here.

■ Nor does this become an "interested" director transaction merely because certain board members are large stockholders. As this Court has previously noted, that fact alone does not create a disqualifying "personal pecuniary interest" to defeat the operation of the business judgment rule. *Cheff v. Mathes*, 199 A.2d at 554.

■ Mesa also argues that the exclusion permits the directors to abdicate the fiduciary duties they owe it. However, that is not so. The board continues to owe Mesa the duties of due care and loyalty. But in the face of the destructive threat Mesa's tender offer was perceived to pose, the board had a supervening duty to protect the corporate enterprise, which includes the other shareholders, from threatened harm.

■ Mesa contends that the basis of this action is punitive, and solely in response to the exercise of its rights of corporate democracy.[14] Nothing precludes Mesa, as a stockholder, from acting in its own self-interest. *See e.g., DuPont v. DuPont*, 251 Fed. 937 (D.Del.1918), *aff'd* 256 Fed. 129 (3d Cir.1918); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Ringling*, Del.Supr., 53 A.2d 441, 447 (1947); *Heil v. Standard Gas & Electric Co.*, Del.Ch., 151 A. 303, 304 (1930). *But see, Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*, Del.Ch., 120 A. 486, 491 (1923) (majority shareholder owes a fiduciary duty to the minority shareholders). However, Mesa, while pursuing its own interests, has acted in a manner which a board consisting of a majority of independent directors has reasonably determined to be contrary to the best interests of Unocal and its other shareholders. In this situation, there is no support in Delaware law for the proposition that, when responding to a perceived harm, a corporation must guarantee a benefit to a stockholder who is deliberately provoking the danger being addressed. There is no obligation of self-sacrifice by a corporation and its shareholders in the face of such a challenge.

Here, the Court of Chancery specifically found that the "directors' decision [to oppose the Mesa tender offer] was made in the good faith belief that the Mesa tender offer is inadequate." Given our standard of review under *Levitt v. Bouvier*, Del. Supr., 287 A.2d 671, 673 (1972), and *Application of Delaware Racing Association*, Del.Supr., 213 A.2d 203, 207 (1965), we are satisfied that Unocal's board has met its burden of proof. *Cheff v. Mathes*, 199 A.2d at 555.

## VI.

■ In conclusion, there was directorial power to oppose the Mesa tender offer, and to undertake a selective stock exchange made in good faith and upon a reasonable investigation pursuant to a clear duty to protect the corporate enterprise. Further, the selective stock repurchase plan chosen by Unocal is reasonable in relation to the threat that the board rationally and reasonably believed was posed by Mesa's inadequate and coercive two-tier tender offer. Under those circumstances the board's action is entitled to be measured by the standards of the business judgment rule. Thus, unless it is shown by a preponderance of the evidence that the directors' decisions were primarily based on perpetuating themselves in office, or some other breach of fiduciary duty such as fraud, overreaching, lack of good faith, or being uninformed, a Court will not substitute its judgment for that of the board.

In this case that protection is not lost merely because Unocal's directors have

---

**14.** This seems to be the underlying basis of the trial court's principal reliance on the unreported Chancery decision of *Fisher v. Moltz*, Del.Ch. No. 6068 (1979), published in 5 Del.J.Corp.L. 530 (1980). However, the facts in *Fisher* are thoroughly distinguishable. There, a corporation offered to repurchase the shares of its former employees, except those of the plaintiffs, merely because the latter were then engaged in lawful competition with the company. No threat to the enterprise was posed, and at best it can be said that the exclusion was motivated by pique instead of a rational corporate purpose.

tendered their shares in the exchange offer. Given the validity of the Mesa exclusion, they are receiving a benefit shared generally by all other stockholders except Mesa. In this circumstance the test of *Aronson v. Lewis,* 473 A.2d at 812, is satisfied. *See also Cheff v. Mathes,* 199 A.2d at 554. If the stockholders are displeased with the action of their elected representatives, the powers of corporate democracy are at their disposal to turn the board out. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811 (1984). *See also* 8 *Del.C.* §§ 141(k) and 211(b).

With the Court of Chancery's findings that the exchange offer was based on the board's good faith belief that the Mesa offer was inadequate, that the board's action was informed and taken with due care, that Mesa's prior activities justify a reasonable inference that its principle objective was greenmail, and implicitly, that the substance of the offer itself was reasonable and fair to the corporation and its stockholders if Mesa were included, we cannot say that the Unocal directors have acted in such a manner as to have passed an "unintelligent and unadvised judgment". *Mitchell v. Highland-Western Glass Co.,* Del. Ch., 167 A. 831, 833 (1933). The decision of the Court of Chancery is therefore REVERSED, and the preliminary injunction is VACATED.