# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE HUFF ENERGY FUND, L.P., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 11116-VCS** |
| | : | |
| ROBERT D. GERSHEN, RICK M. | : | |
| PEARCE, D. RANDOLPH WAESCHE, | : | |
| THOMAS VESSELS, GEORGE KEANE, | : | |
| HAROLD CARTER, and LONGVIEW | : | |
| ENERGY COMPANY, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: July 8, 2016
Date Decided: September 29, 2016

Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, A. Zachary Naylor, Esquire, and Tiffany J. Cramer, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Donald J. Wolfe, Jr., Esquire, Timothy R. Dudderar, Esquire, Aaron R. Sims, Esquire, and Frank R. Martin, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendants.

SLIGHTS, Vice Chancellor

Plaintiff, The Huff Energy Fund, L.P. ("Huff Energy"),[1] brought this action to challenge Longview Energy Company's decision, approved by its board of directors (the "Board," and together with Longview, the "Defendants") and its stockholders, to dissolve Longview following a sale of a significant portion of its assets. Huff Energy was a stockholder of Longview at all relevant times and, upon its initial investment, entered into a shareholders agreement (the "Shareholders Agreement") with Longview that, *inter alia*, required a unanimous vote of the Board for any act that would have "a material adverse effect" on the rights of Longview's stockholders as "set forth" in the agreement.

In April 2014, the Board decided to sell Longview's California oil and gas properties and related assets ("the California Assets"). In September 2014, Longview circulated to stockholders a fully-negotiated, but yet unsigned, purchase and sale agreement for the California Assets at a proposed price of $43.1 million. To alleviate the potential tax burden to stockholders, the Board, at the behest of the two directors designated by Huff Energy, agreed to dissolve Longview following the asset sale as part of the transaction. Within a month of this proposal, oil prices collapsed, the value of the California Assets decreased and the buyer elected to walk away from the proposed transaction.

---

[1] Huff Energy is so designated to avoid confusion with its namesake, William R. Huff.

In May 2015, Longview circulated a new purchase and sale agreement for the California Assets, including a plan of dissolution, at a price of $28 million. The Board approved the transaction over the abstention of the one Huff Energy designee who was present for the vote. Longview's stockholders approved the asset sale and plan of dissolution the following month, on June 11, 2015.

Huff Energy's Verified Amended Complaint ("the Complaint") alleges that: (1) because the plan of dissolution had a material adverse effect on Longview's stockholders, particularly Huff Energy, unanimous board approval was required, and since the director designated by Huff Energy abstained, the less-than-unanimous approval of the plan constituted a breach of the Shareholders Agreement (Count I); and (2) the Board breached its fiduciary duties by adopting the plan of dissolution without exploring more favorable alternatives in violation of *Revlon*[2] and as an unreasonable response to a perceived threat in violation of *Unocal*[3] (Count II).

Defendants respond by arguing that (1) the individual Board members, as non-parties to the Shareholders Agreement, cannot be held liable for any alleged breach of that contract by Longview; (2) unanimous Board approval of the plan of dissolution was not necessary because it in no way harmed Longview's

---

[2] *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 174 (Del. 1986).

[3] *Unocal Corp. v. Mesa Petr. Co.*, 493 A.2d 946 (Del. 1985).

stockholders and certainly did not have a material adverse effect on the rights of Huff Energy as set forth in the Shareholders Agreement; and (3) *Revlon* and *Unocal* are not implicated here and, in any event, the business judgment rule irrebuttably applies and is dispositive of Huff Energy's breach of fiduciary duty claims by virtue of the uncoerced, fully informed approval of the plan of dissolution by Longview stockholders.

For the reasons set forth below, I agree with Defendants on all points. The Motion to Dismiss is granted.

## I.  BACKGROUND

I draw the facts from allegations in the Complaint, documents integral to the Complaint and matters of which I may take judicial notice, including public filings.[4]  The well-pled facts alleged in the Complaint, while disputed by the Defendants, are deemed true at this stage of the proceedings.[5]

### A. The Parties

Huff Energy is a Delaware limited partnership that owned 2,275,627 shares, or approximately 40%, of Longview's outstanding common stock, making it Longview's largest stockholder.  Longview was a Delaware corporation with its

---

[4] *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010).

[5] *Id.*

principal place of business in Dallas, Texas. Longview's Board was authorized to be comprised of nine seats, although only eight were filled during the times relevant to this action. Pursuant to its right in the Shareholders Agreement to name two Board members, Huff Energy appointed William R. Huff ("Huff") and Richard D'Angelo as its designees.

Defendant Robert D. Gershen was Longview's Chief Executive Officer and a member of the Board. Defendant Rick M. Pearce was Longview's Chief Operating Officer and a member of the Board. Defendants D. Randolph Waesche, Thomas Vessels, George Keane and Harold Carter comprised the remaining non-Huff Energy directors (together with Gershen and Pearce, the "Director Defendants"). Gershen had sundry outside business relationships with other Board members, including serving on the board of Energy Finance Limited with Vessels, serving on the board of Energy Partners Ltd. with Waesche and Carter, serving on the board of Vessels Coal Gas Inc. (upon which Waesche and Carter had previously served) with Vessels, serving on the board of Saxon Oil Co. Ltd. with Vessels and Carter and serving on the board of the Common Fund, now known as the Common Fund Group, of which Keane is a founder, with Carter.

Gershen and Pearce also had employment agreements with Longview that provided for a severance payment upon a change of control, defined to include "a sale or other transaction whereby more than fifty (50) percent in value of the assets

4

of the Company are no longer owned by the Company."[6] Gershen's employment agreement provided for a severance payment of at least one year's salary. Pearce's employment agreement provided for a severance payment of at least two years' salary.

## B. The Shareholders Agreement

In 2006, Huff Energy purchased 20% of Longview's outstanding stock at $19 per share. In connection with its purchase, Huff Energy and Longview executed the Shareholders Agreement. Relevant to this dispute, the Shareholders Agreement provided that (1) any transfer by Huff Energy of its Longview stock was subject to a right of first offer to Longview and other conditions not relevant here; (2) Huff Energy could designate two directors to Longview's Board; (3) Longview would continue to exist and remain in good standing under Delaware law by making timely filings and payments of required fees; (4) Longview would make reasonable efforts to ensure that the rights granted in the Shareholders Agreement are effective; (5) a two-thirds vote of the Board was required for "any resolution authorizing or approving any fundamental changes in [Longview's] business or business plan" or "any merger or sale of all or substantially all of [Longview's] assets"; and (6) a unanimous vote of the Board was required for any

---

[6] Compl. ¶ 19.

act or omission that would have "a material adverse effect on the rights of any Shareholder as set forth in this Agreement."[7]

## C. Gershen Attempts to Sell Longview to Achieve Liquidity and Trigger Contractual Severance Payments

During the four years following its initial investment, Huff Energy increased its stake in Longview to approximately 40%. The Complaint alleges that Gershen expressed displeasure with Huff Energy's increasing stake, viewing the investment as a threat to his otherwise unfettered influence over Longview.[8] Beginning in 2008, at Gershen's urging, Longview began actively to pursue a liquidity event either through a sale of assets or merger. According to Huff Energy, this priority was fueled in part by Gershen and Pearce's desire to trigger the substantial severance payments required by their respective employment agreements in the event of a change of control, and persisted notwithstanding the best interests of Longview's stockholders.[9]

---

[7] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") Ex. F (the "Shareholders Agreement") § 2(b) (designation by Huff Energy of two Board members); § 6(a) (Longview's right of first offer for Huff Energy's shares); § 9(a) (maintenance of corporate existence); § 9(d) (Longview to make best efforts to ensure that Huff Energy's rights under the Shareholders Agreement are protected); § 10(a)(ii), (iv) (sale of all or substantially all assets, merger or fundamental change in business requires two-thirds Board approval); § 10(b)(iii) (action having "material adverse effect" on stockholders' rights as "set forth" in the Shareholders Agreement, requires unanimous Board approval).

[8] Compl. ¶¶ 30–33.

[9] Compl. ¶ 75.

6

When the 2008 financial crisis hindered Longview's chances to achieve a liquidity event, Huff Energy and its Board representatives encouraged Longview to purchase distressed assets in furtherance of an overall growth strategy. To that end, the Board authorized Longview to interview bankers to seek out and assist with potential acquisitions. Gershen, however, ignored this Board directive and instead dispatched the banker engaged by the Board to seek out either a merger partner or a buyer for Longview assets.

In January 2010, the Board decided to sell Longview's Oklahoma properties. D'Angelo objected to the sale arguing that the Board had failed adequately to analyze the transaction and negotiate the best price for the assets. Notwithstanding the Board's approval of the transaction, Longview management ultimately ignored the Board's directive to sell the Oklahoma properties after unilaterally determining that it would be preferable to sell Longview as a whole rather than in parts.

In 2010 and 2011, Gershen pursued a merger with a Canadian oil and gas company. Huff Energy's Board representatives opposed the merger after Longview management reported that the prospective merger partner had engaged in misleading and potentially fraudulent accounting practices. Gershen, however, continued to support the merger, claiming that the Longview stockholders could avoid harm by selling their post-merger stock before the fraud became public. The

proposed merger failed, however, when the acquirer was unable to obtain financing.

### D. The Sale of the California Assets

In 2011, Longview retained Parkman Whaling, a boutique oil and gas investment banking firm, to assist in identifying and evaluating potential merger partners. Over the following three years, Parkman Whaling was unable to find a suitor interested in acquiring the entire company. The Board was advised, however, that several potential buyers were interested in Longview's California Assets, consisting primarily of oil and gas properties and drilling and coring assets. For reasons unclear, Longview's Oklahoma oil and gas assets were not drawing interest. The Board relented and focused its efforts on a sale of the California Assets separate from the remainder of Longview. These assets generated approximately 90% of Longview's operating revenue.

In September 2014, Longview circulated to the Board a "fully negotiated" purchase and sale agreement ("PSA") for the California Assets at $43.1 million. By its terms the PSA anticipated that execution would occur only after Board approval with the closing conditioned on subsequent stockholder approval.

Upon receipt of the Board materials, Huff Energy's Board representatives requested basic analytic information not yet disclosed, including a fairness opinion from Parkman Whaling and information about the post-sale operation of Longview's remaining assets. Huff Energy also expressed its concern to Longview that the transaction as contemplated could result in negative tax consequences when proceeds from the sale were distributed to Longview's stockholders. Specifically, as structured, the proposed distribution to Longview's stockholders "would have been taxed as a dividend, notwithstanding the fact that many stockholders ha[d] a tax basis well in excess of the amount of cash to be distributed."[10] To alleviate the tax burden, Huff Energy suggested that Longview adopt a plan of liquidation and distribute the sale proceeds in connection with that plan. Longview acquiesced to Huff Energy's requests and, several weeks later, recirculated the transaction materials which now included a disclosure that Parkman Whaling would provide a fairness opinion and that Longview would adopt a plan of liquidation given the impending distribution to Longview's stockholders.

---

[10] Compl. ¶ 38.

In early October 2014, prior to the scheduled Board meeting to vote on the proposed sale, oil prices collapsed and the value of the California Assets tumbled. Because the parties had not yet executed the PSA, the buyer elected to withdraw from the transaction.

Notwithstanding the low oil prices, Longview management continued to seek a buyer for the California Assets. On May 14, 2015, management circulated a new proposed transaction with White Knight Production, LLC ("White Knight") for the same California Assets at a sale price of $28 million. The Board materials represented that Longview was in covenant default under a loan agreement, and that the lender reduced Longview's borrowing base from $31.5 million to $17 million (which was still in excess of the loan balance). The lender also accelerated the loan's maturity date from January 2016 to September 2015. Longview was in need of cash.

The May 14, 2015 Board materials also included a proposed proxy statement indicating that the Board would seek stockholder approval for (1) the sale of the California assets and, separately, (2) the adoption of a plan of dissolution ("the Plan of Dissolution"). The draft proxy statement, circulated later the same day, indicated that the transaction would result in a distribution to stockholders but omitted the amount.

Two business days later, on May 18, 2015, the Board met telephonically to approve the transaction, at which time Huff Energy learned for the first time that Longview would make no distribution to stockholders, and would instead retain all net sale proceeds. The final proxy statement (the "Proxy Statement") delivered to Longview's stockholders makes this clear: "The Company anticipates that the process to determine the proper amount of contingency reserve may be lengthy and that Stockholders will not receive any liquidating distributions for an extended period of time following filing of the Certificate of Dissolution."[11] Though the Board approved the transaction, adoption of the Plan of Dissolution and distribution of the Proxy Statement, D'Angelo, the lone Huff Energy director present during the meeting, abstained due to "the insufficiency of information and rushed nature of the approval and deliberation process."[12]

During the Board meeting on May 18, a Huff Energy representative attempted to give comments regarding the draft proxy statement. The Board shut this discussion down, however, and directed Huff Energy to forward any comments to Longview's in-house counsel and an attorney from Longview's outside counsel. Though certain of Huff Energy's suggestions were accepted and implemented, others, including disclosures regarding D'Angelo's abstention and

---

[11] Compl. ¶ 46.

[12] Compl. ¶ 48.

11

recent developments in the Texas Litigation (discussed below) were not included in the Proxy Statement. The Proxy Statement did, however, disclose that, upon approval and filing of the Plan of Dissolution, each holder of common stock "will cease to have any rights in respect thereof other than to receive distributions (if any) in accordance with the Plan of Dissolution."[13]

In a letter to the Longview Board dated June 5, 2015, Huff Energy requested that the Board rescind its request for approval of the Plan of Dissolution since Longview's withholding of the net sale proceeds would negate any tax burden associated with a distribution. The letter also included a list of various potential harmful effects of adoption of the Plan of Dissolution, including:

> eliminat[ing] the transferability of Longview shares and render[ing] the stockholders unable to enter into private sales of their shares; limit[ing] the alternatives to a potential buyer of Longview's remaining assets to an asset sale; signal[ing] to any potential buyer of the Oklahoma properties the fact that those properties must be sold, thereby reducing the likelihood of [Longview] receiving true fair market value for those properties; eliminat[ing] the ability to sell the Company to a buyer who might want to try and benefit from Longview's extant net operating loss; and eliminate[ing] any possibility of a tender offer for the Longview shares.[14]

On June 8, without meeting, the Board, by email, denied Huff Energy's request.

---

[13] Compl. ¶ 53 (quoting the Proxy Statement).

[14] Compl. ¶ 57.

### E. The Texas Litigation

On September 26, 2011, Longview brought an action against Huff Energy, 1776 Energy Partners, LLC ("1776," Huff's portfolio company) and certain 1776 affiliates including Huff and D'Angelo (the "Texas Defendants"), alleging that Huff and D'Angelo breached their fiduciary duties to Longview by usurping a corporate opportunity in connection with 1776's acquisition of certain oil and gas leases (the "Texas Litigation"). The litigation resulted in a jury finding Huff, D'Angelo, 1776 and Huff Energy liable for breaches of fiduciary duties to Longview with a damages verdict of $10.5 million. On December 14, 2012, however, the Texas trial court amended the judgment to increase the amount of the verdict to $95.5 million and required 1776 to turn over to Longview the assets subject to the judgment.

On September 20, 2012, Huff Energy, on behalf of all Texas Defendants, posted a $25 million supersedeas bond, the maximum required to be posted in Texas, to suspend enforcement of the judgment. The Texas Defendants then filed a notice of appeal, and on June 3, 2015, presented oral argument to the Texas Fourth Court of Appeals.

In the interim, Longview challenged the amount of the bond the Texas Defendants were required to post to suspend the judgment, arguing that the $25 million maximum applied per judgment debtor, not per judgment, and requesting

13

that the remaining four parties also post $25 million each. The trial judge approved Longview's request, the Texas Defendants appealed, and the Fourth Court agreed with the Texas Defendants and ruled that the $25 million cap applied per judgment. Longview appealed that determination to the Texas Supreme Court, and on May 8, 2016, the Texas Supreme Court issued its ruling. Rather than reaching the bond cap issue, however, the Texas Supreme Court held that the $95.5 million judgment had no basis in fact or law as a compensatory award and thus must have been largely comprised of punitive damages. Consequently, the court determined that the Texas Defendants were required to post a bond of only $66,000—a fact Longview refused to add to the Proxy Statement.

## F. Ramifications of the Asset Sale, Plan of Dissolution and Texas Litigation

Two factors resulted in Longview's conclusion that it could not make an immediate distribution to stockholders following the asset sale: (1) the value and ultimate purchase price of the California Assets fell precipitously in 2014, and (2) the Texas Supreme Court weighed in on the Texas Litigation. The impact of the drop in sale price from $43.1 million to $28 million reduced any potential distribution by over $15 million, or nearly $2.50 per share. Even considering the reduced price, however, "the Proxy Statement calculated over $9 million in

proceeds remaining *before setting up a reserve for liabilities*."[15]  The impact of the Texas Supreme Court's ruling affected the liability reserve.  If the Texas Supreme Court reverses the Texas Litigation judgment against Huff and D'Angelo, both will contend they are entitled to indemnification from Longview for their legal fees and costs in connection with the Texas Litigation.  "Huff Energy disclosed to the Board that any such amount could be in excess of [$10 million]."[16]  The Texas Supreme Court's recent rejection of the amended judgment and reinstatement of the Jury's $10.5 million verdict heightened Longview's concerns regarding indemnification of the Huff Energy directors and potentially increased Longview's target post-sale reserve liabilities.

In addition, the Complaint alleges that the Plan of Dissolution frustrates any potential tender offer Huff Energy may have made for Longview, which could have resolved the Texas Litigation.  According to Huff Energy, Defendants recognized the possibility that Huff Energy would offer to purchase the remainder of Longview's shares, and were concerned about a sale of Longview in which Defendants were not in control.  Adopting the Plan of Dissolution eliminated Huff Energy's ability to purchase Longview shares.[17]

---

[15] Compl. ¶ 72 (emphasis added).

[16] Compl. ¶ 73.

[17] Compl. ¶¶ 77–78.

The Complaint alleges that the Plan of Dissolution further harmed Huff Energy by (1) depriving Huff Energy of its right to transfer or pledge Longview shares and, concomitantly, foreclosing a potential financing opportunity for 1776; (2) precluding Huff Energy from appointing two directors to the Board; and (3) depriving Huff Energy of any ability to attain value for its Longview stock until a liquidating distribution, if any, is made pursuant to the Plan of Distribution.[18]

To address these harms Huff Energy seeks (1) an order enjoining Longview from paying bonuses to certain Defendants; (2) a declaration that issuance of the Proxy Statement and Plan of Dissolution violated Sections 9(a), 9(d) and 10(b)(iii) of the Shareholders Agreement; (3) a declaration that the Director Defendants breached the Shareholders Agreement and their fiduciary duties in connection with the Plan of Dissolution; (4) a grant of appropriate equitable relief; (5) an order directing Defendants to disgorge all profits as a result of their allegedly unlawful conduct; (6) an award of compensatory damages; and (7) an award of fees and expenses.[19]

---

[18] Compl. ¶¶ 80–91.

[19] Huff Energy does not contest any aspect of the sale of the California Assets. Its claims for breaches of contract and fiduciary duty are directed only to the approval and adoption of the Plan of Dissolution. Compl. ¶¶ 80–91 (breach of contract); ¶¶ 92–98 (breach of fiduciary duty).

## II.    ANALYSIS

### A. Motion to Dismiss Standard

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[20]  That is, "[t]he Court will grant the motion only if Plaintiff 'could not recover under any reasonably conceivable set of circumstances susceptible of proof.'"[21]  In making this determination, the Court accepts as true all well-pled allegations in the Complaint, but "should not accept as true conclusory statements unsupported by fact nor should it draw unreasonable inferences in favor of plaintiffs."[22]

### B. Defendants Did Not Breach the Shareholders Agreement

To plead a breach of contract claim sufficient to withstand a motion to dismiss, a plaintiff must allege facts from which the Court may reasonably infer the existence of: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[23]  In Delaware, the "interpretation of contractual language is a question of law; thus, where the terms

---

[20] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[21] *Shaev v. Adkerson*, 2015 WL 5882942, at *3 (Del. Ch. Oct. 5, 2015) (quoting *Cent. Mortg.*, 27 A.3d at 536).

[22] *Sample v. Morgan*, 914 A.2d 647, 662 (Del. Ch. 2007).

[23] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

of a contract are unambiguous, the meaning thereof is suitable for determination on a motion to dismiss."[24]  In determining whether disputed terms are subject to more than one reasonable interpretation, "Delaware courts are obligated to confine themselves to the language of the document and [may] not to look to extrinsic evidence to find ambiguity."[25]

### 1. The Director Defendants Cannot be Liable for the Alleged Breach of Contract

"It is a general principle of contract law that only a party to a contract may be sued for breach of that contract."[26]  Under Delaware law, "officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."[27]  Huff Energy argues two bases upon which the Court can depart from this settled law and hold the Director Defendants individually liable for a breach of the Shareholders Agreement.

First, Huff Energy alleges that three of the Director Defendants were signatories to the Shareholders Agreement and may therefore be sued for breach of

---

[24] *Travelers Cas. & Sur. Co. v. Sequa Corp.*, 2012 WL 1931322, at *4 (Del. Ch. May 29, 2012) *overruled on other grounds, Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013).

[25] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001).

[26] *Wallace ex rel. Cencom Cable Income P'rs II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).

[27] *Id.*

that contract. While it is true that Gershen Waesche, Vessel and Carter signed the Shareholders Agreement, it is clear on the face of the document that they did so in a representative, not individual, capacity. They are not parties to the contract and merely executing an agreement on behalf of a stockholder who is a party to the agreement does not create liability for that signatory in his or her capacity as an officer or director of the corporation.[28] The Director Defendants were not personally obligated to perform under the contract and cannot be held liable for breach of the contract.

Huff Energy's second argument is clearly an afterthought. Like the plaintiffs in *Wallace*, Huff Energy, in its Answering Brief, "abandon[ed its] breach of contract claim . . ., choosing instead to assert a tortious interference claim."[29] Specifically, Huff Energy argues that the Director Defendants may be held liable for tortious interference with contract for causing Longview to adopt the Plan of Dissolution in breach of the Shareholders Agreement. To plead a tortious interference claim, Huff Energy must properly allege the existence of "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a

---

[28] *See Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1133 (Del. Ch. 2008).

[29] *Wallace*, 752 A.2d at 1180.

19

significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[30]

I note that Huff Energy failed to plead a tortious interference count in the Complaint and this Court does not countenance efforts to raise causes of action for the first time in a brief filed in opposition to a case dispositive motion.[31] Even if Huff Energy had expressly pled a tortious interference claim in a separate count, there are no facts pled in the Complaint that would support it. Notably, Huff Energy identifies no facts that would allow a reasonable inference that any Director Defendant intentionally caused Longview to breach the Shareholders Agreement or that any conduct by any Director Defendant was without justification. Instead, Huff Energy argues that "directors and officers can be held personally liable [for tortious interference] if it is alleged that these actors have 'exceed[ed] the scope' of their employment in taking such actions."[32] The Complaint's only specific allegations that even hint that the Director Defendants exceeded the scope of their employment, however, relate to Gershen's alleged "animosity" toward Huff Energy in response to Huff Energy's "continuous

---

[30] *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987).

[31] *See Fletcher Int'l, Ltd. V. Ion Geophysical Corp.*, 2011 WL 1167088, at *5 n.42 (Del. Ch. March 29, 2011); *see also Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1266 (Del. 2004) (noting that tortious interference with contract is a separate, free-standing cause of action that is not subsumed within a breach of contract claim).

[32] Pl.'s Answering Br. 37 (alteration in original).

recommendations . . . for [Longview] to . . . evaluate value-maximizing strategic alternatives" and the Director Defendants "personal, selfish and/or retaliatory motives."[33] These conclusory allegations hardly put the Director Defendants on notice that Huff Energy was alleging that they acted outside the "scope of their employment" with Longview or tortiously interfered with the Shareholders Agreement.

Huff Energy cites *Nye v. Univ. of Delaware*[34] to substantiate its contention that allegations of bad motives and animosity rise to the requisite level of interestedness that would support an inference that the Director Defendants acted outside the scope of their employment. In *Nye*, the court found that the plaintiff "sufficiently plead a claim for breach of the implied covenant of good faith and fair dealing" based on well-pled allegations that "the University [intentionally] falsified grounds to engineer the removal of Dean Nye."[35] No facts remotely approximating this degree of misbehavior have been pled here. Moreover, Huff Energy has made no effort to present argument that its Complaint contains allegations that would meet the remaining elements of tortious interference (including that the Defendants

---

[33] *Id.*

[34] 2003 WL 22176412, at *4 (Del. Super. Sept. 17, 2003).

[35] *Id.*

21

acted without justification).[36] Instead, it argues summarily that the same facts that support its breach of contract claim support its tortious interference claim.[37] This is not sufficient to state a viable claim, particularly where the Complaint does not separately designate a tortious interference cause of action.

### 2. Plaintiff Has Failed to Plead Breach of Contract Against Any Defendant

Huff Energy alleges that the Board's adoption of the Plan of Dissolution violated the following provisions of the Shareholders Agreement: (a) Section 10(b)(iii), which required unanimous Board approval of "any action or omission that would have a material adverse effect on the rights of any Shareholder, as set forth in this Agreement" including, according to Huff Energy, its purported "right of transferability" of its Longview stock; (b) Section 9(d), which required Longview to "use reasonable efforts to ensure that the rights granted [under the Shareholders Agreement] are effective and that the Shareholders enjoy the benefits thereof"; (c) Section 9(a), which provided that Longview "shall continue to exist and shall remain in good standing under the laws

---

[36] *Wallace*, 752 A.2d at 1182–83 ("[E]mployees acting within the scope of their employment are identified with the defendant himself so that they may ordinarily advise the defendant to breach his own contract without themselves incurring liability in tort. This rationale is particularly compelling when applied to corporate officers as 'their freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability.'" (alteration in original) (footnotes and internal quotation marks omitted)).

[37] Pl.'s Answering Br. 36.

of its state of incorporation and under the laws of any state in which [Longview] conducts business"; and (d) Section 2(b), which allowed Huff Energy to appoint two directors to the Board. I address these alleged breaches in turn.

### a. The Shareholders Agreement did not "Set Forth" a Right of Transferability

As stated, Section 10(b)(iii) of the Shareholders Agreement requires unanimous Board approval of "any action or omission that would have a material adverse effect on the rights of any [Longview shareholder], *as set forth in*" the Shareholders Agreement (emphasis added). Huff Energy argues that the Shareholders Agreement "set[s] forth" a "right of transferability," and that the Board's adoption of the Plan of Dissolution materially and adversely affected that right. According to Huff Energy, the "right of transferability" is reflected in the following language in Section 6(a), entitled "Right of First Offer":

> If any Shareholder proposes to sell, assign, pledge or in any manner transfer any [Longview stock], . . . to any third party other than [a Longview] affiliate, then such Selling Shareholder shall first grant [Longview] the right to purchase the [offered shares] at the same price and on the same terms as . . . [offered] to [the] third party.

Huff Energy argues that because the Shareholders Agreement acknowledges that Longview stockholders can sell their shares, that "right" is "set forth" in the agreement and is therefore subject to Section 10(b)(iii)'s unanimity requirement. It concedes, however, that any "right" it might possess to transfer its Longview stock originates outside of and notwithstanding the Shareholders Agreement's

23

acknowledgement of that "right."[38] In other words, the "right to transfer" is not created by the Shareholders Agreement.

The claim of breach under Section 10(b)(iii), therefore, turns on the construction of the phrase "set forth": if "set forth" means "created," then the purported the "right of transferability" would escape Section 10(b)(iii)'s unanimity requirement because the right was not created by the contract; if, however, "set forth" means that the unanimity requirement applies to any act or omission that has a materially adverse effect on any right that is merely "referenced" in the contract, then Huff Energy's interpretation, at least at this stage of the proceedings, might prevail to the extent a right of transfer is referenced in Section 6(a).

Huff Energy's construction of Section 10(b)(iii), on several levels, contradicts common sense and the business realities of the parties' relationship as reflected in the Shareholders Agreement. First, to interpret Sections 6 and 10 as granting Huff Energy a veto power over any Board act that has a materially adverse effect on its right to transfer its stock contradicts the sole purpose of Section 6(a), which is to grant *Longview* a right of first offer. In fact, the phrase "[if] any Shareholder proposes to sell [its stock] . . . then such Selling Shareholder

---

[38] Tr. of Oral Arg. of Defs.' Mot. to Dismiss ("Oral Arg. Tr.") 52. I note that Huff Energy has never identified the origin of its "right to transfer" so it is difficult to evaluate whether it has stated a claim that the Plan of Dissolution had a material adverse effect on that right. I need not dwell on this question, however, because I am satisfied that any right of transfer Huff Energy might possess is not subject to Section 10(b)(iii).

24

shall first [offer such stock to Longview on the same terms]" *restricts* any preexisting right to transfer—it in no way "sets forth" that right.

Second, adopting Huff Energy's interpretation of Sections 6 and 10 would result in an arbitrary distinction between rights falling within and without Section 10(b)(iii)'s purview. For example, the purpose of Section 6 of the Shareholders Agreement was to create a right of first offer for Longview. To describe the right of first offer precisely, the drafters saw fit to assume that Huff Energy could transfer its shares.[39] A finding that the phrase "set forth" in the Agreement means "referenced" in the agreement would therefore subject all extra-contractual "rights" to Section 10(b)(iii)'s unanimity requirement solely because the "right" was referenced in relation to another right actually created by the Shareholders Agreement. I cannot reasonably infer that the drafters intended such a result. Therefore, I conclude that the only reasonable construction of the phrase "set forth" within Section 10(b)(iii) is that it means "created by" the Shareholders Agreement.[40] Because the Shareholders Agreement did not create a "right of transferability," and because the parties expressed no intent to reference pre-

---

[39] *Id.* (Huff Energy counsel stating that Section 6(a) "obviously assumes a right to transfer.").

[40] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014) (holding that where there is only one reasonable interpretation of a contract, claims based upon another interpretation should be dismissed as a matter of law).

existing rights within Section 10(b)(iii), I reject Huff Energy's argument that the less-than-unanimous Board adoption of the Plan of Dissolution violated Section 10(b)(iii) of the Shareholders Agreement.

### b. *The Plan of Dissolution Did Not Violate Section 9(a)*

Huff Energy next argues that the Board's less-than-unanimous adoption of the Plan of Dissolution violated Section 9(a) of the Shareholders Agreement, which provided that Longview "shall continue to exist and shall remain in good standing under the laws of its state of incorporation and under the laws of any state in which [it] conducts business." This argument attempts to meld Section 10(b)(iii)'s unanimity requirement with Section 9(a)'s purported "covenant that [Longview] will continue to exist."[41] Counsel for Huff Energy acknowledged as much in prior proceedings in this Court.[42] Once again, Huff Energy has offered an unreasonable construction of the Shareholders Agreement that contradicts its clear terms.

I start by noting that Section 9(a) appears to be nothing more than a recognition by Longview that it will remain in good standing as a Delaware corporation. It speaks to a commitment to make necessary filings and pay required

---

[41] Pl.'s Answering Br. 22.

[42] *See* Defs. Opening Br. in Supp. of their Mot. To Dismiss the Verified Am. Compl. Ex. C, at 9–10 ("THE COURT: . . . Is it your view that there can never be a plan of dissolution implemented as long as Huff Energy is a shareholder and it continues to oppose the plan of dissolution? MR. KRINER: Yes, Your Honor.")

fees and expenses. It is a stretch to read more into the provision, particularly the commitment to exist "come what may" that Huff Energy ascribes to it.

A more rigorous analysis of Huff Energy's construction of Section 9(a)—that the provision requires Longview to exist eternally unless Huff Energy agrees otherwise—reveals that it is inconsistent with and would render meaningless other provisions within the Shareholders Agreement. For example, Section 10(a) of the Shareholders Agreement requires a vote of two-thirds of the Board to engage in a merger or sale of substantially all of Longview's assets.[43] A merger in certain forms would have the same effect on Section 9(a) as the Plan of Dissolution (Longview would cease to exist), yet the Shareholders Agreement explicitly provides for a two-thirds vote. Indeed, since "dissolution" is not listed under the Shareholders Agreement's supermajority provisions, and is not referenced in Section 10(b), it is reasonable to read the Shareholders Agreement to allow the Board to approve a plan of dissolution by majority vote.

Finally, if the Court adopted Huff Energy's interpretation of Section 9(a), any dissolution, even a dissolution that is patently in the best interests of the corporation and its stockholders, would in all events violate the Shareholders

---

[43] Shareholders Agreement § 10(a)(iv).

Agreement absent Huff Energy's endorsement.[44] The drafters of the Shareholders Agreement could not have intended to place this kind of restriction on the Board without expressly saying so in the contract.[45] Therefore, the Complaint fails to plead facts from which I can reasonably infer that the Plan of Dissolution breached Section 9(a) of the Shareholders Agreement.

### c. The Plan of Dissolution Did Not Violate Sections 2(b) or 9(d)

The Complaint alleges that the Plan of Dissolution violates Section 2(b), when read in conjunction with Section 10(b)(iii), because it materially and adversely denies Huff Energy's right to appoint two directors to the Board. Defendants moved to dismiss this claim but Huff Energy has not pressed it since raising it in its Complaint—it did not address the claim in its Answering Brief or at oral argument. Consequently, the motion to dismiss this claim stands unopposed.

---

[44] In response to the Court's question whether dissolution would always amount to a breach of Section 9(a), Huff Energy stated "[t]he way this is written, that's correct, Your Honor, always." Oral Arg. Tr. 67.

[45] *Osborn v. Kemp,* 991 A.2d 1153, 1160–61 (Del. 2010) (the court will avoid interpretations of contracts that produce "absurd" results); *Delta & Pine Land Co. v. Monsanto Co.*, 2006 WL 1510417, at *4 (Del. Ch. May 24, 2006) ("[C]ontracts must be interpreted in a manner that does not render any provision 'illusory or meaningless.'"); *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002) ("A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole."); *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 971 (Del. Ch.) ("An interpretation that gives an effect to each term of an agreement, instrument or statute is to be preferred to an interpretation that accounts for some terms as redundant."), *aff'd*, 567 A.2d 419 (Del. 1989).

28

In any event, Huff Energy's right to appoint two directors continues without infringement throughout the winding up process. The Board's adoption of the Plan of Dissolution had no effect on Huff Energy's rights under Section 2(b), and therefore this claim of breach must be dismissed.

Section 9(d) of the Shareholders Agreement provides that Longview "agrees to use reasonable efforts to ensure that the rights granted hereunder are effective and that the Shareholders enjoy the benefits thereof." Having determined that Huff Energy has not well-pled that the Board's adoption of the Plan of Dissolution adversely affected any "right" set forth in the Shareholders Agreement, Huff Energy's claim of breach under Section 9(d) must also be dismissed.

## C. The Director Defendants Did Not Breach their Fiduciary Duties

Count II of the Complaint alleges that the Director Defendants breached their fiduciary duties by approving and implementing the Plan of Dissolution. Specifically, Huff Energy argues that: (1) by adopting the Plan of Dissolution, the Director Defendants acted to "advance their own special interests at the expense of Plaintiff and Longview's other stockholders";[46] or (2) the Plan of Dissolution must be reviewed with *Revlon* enhanced scrutiny as a "final stage" transaction because the Director Defendants failed to take reasonable measures to maximize

---

[46] Pl.'s Answering Br. 40.

shareholder value;[47] or (3) it must be reviewed with *Unocal* enhanced scrutiny as an unreasonable defensive measure. Each of these arguments fails, and Count II of the Complaint must be dismissed.

### 1. The Director Defendants were Disinterested and Independent

Under Delaware law, "a breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with loyalty and care."[48] "To rebut the [presumption], a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision," breached their duty of loyalty or care.[49] And to plead a breach of the duty of loyalty, a plaintiff must normally plead facts demonstrating "that a *majority* of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director."[50] Failing to rebut the presumption results in the business judgment rule protecting the directors' challenged decisions, so long as they can be attributed to any rational business purpose.[51]

Huff Energy has failed to rebut the business judgment presumption. The Complaint's only allegations that any individual Board member acted other than in

[47] *Id.* 46.

[48] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 979 (Del. Ch. 2000).

[49] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[50] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (internal quotation marks omitted).

[51] *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del. 1995).

the best interests of Longview are that, upon dissolution, Gershen was to receive a severance payment equal to one year's salary plus bonuses, Pearce was to receive a severance payment equal to two years' salary plus bonuses, Gershen had prior business relationships with other members of the Board (presumably of a nature that would allow him to control their decision making) and Gershen had sought an exit from Longview for years due to his growing animosity toward Huff and Huff Energy. For several reasons, these allegations fall well short of what is required to strip the Director Defendants of the protections of the business judgment rule.

First, "the possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law."[52] In fact, this Court has sanctioned director change-in-control benefits larger than those at issue here.[53] Moreover, although the gravamen of Huff Energy's complaint against the Board is its adoption of the Plan of Dissolution, the severance payments that are alleged to have motivated certain of the Director Defendants to act out of self-interest were actually triggered by the

---

[52] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013).

[53] *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) ("[A] $4.5 million cash severance payment coupled with accelerated vesting of certain options to an executive chairman of a large corporation does not strike me as so far beyond the pale that it would give rise to an improper motive to accomplish a merger."); *Nebenzahl v. Miller*, 1993 WL 488284, at *3 (Del. Ch. Nov. 8, 1993) (finding that employment agreements ensuring that "three executives will receive lump sum payments equal to their salaries for the remainder of the terms of their contracts" upon a change in control did not render such executives "interested").

sale of the California Assets.[54] Huff Energy does not challenge that transaction. Simply stated, the severance provisions in Gershen's and Pearce's respective employment agreements fail to render either director/officer interested in any relevant transaction to a degree that would rebut the business judgment rule.

Second, allegations regarding Gershen's former and then-current business relationships with other Board members, in the absence of any allegation that Gershen either controlled or was controlled by any other member, fail to create a reasonable inference of a disqualifying conflict. Our law is clear that "personal friendships, without more; outside business relationships, without more; and approving of or acquiescing in the challenged transactions, without more, are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment."[55]

Third, Huff Energy's argument that Gershen's animosity towards Huff drove Gershen to act out of self-interest does not square with the well-pled allegations in the Complaint and does not, in any event, rise to the level of any legal significance

---

[54] Compl. ¶¶ 31, 74.

[55] *Cal. Pub. Empls.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *9 (Del. Ch. Dec. 18, 2002) (footnotes omitted); *accord Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004); *Litt v. Wycoff*, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003); *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002).

when considering the appropriate standard of review.[56] The only allegations in the Complaint cited in support of this theory involve Gershen's alleged pursuit, since 2008, of a liquidity event to counter Huff Energy's growing stake in Longview. Why Gershen would seek to relinquish all control and dissolve Longview as a solution to Huff Energy's increasing influence over Longview is unclear. Absent any additional, non-conclusory allegations regarding Gershen's alleged self-interested motivation to adopt the Plan of Dissolution, I am unable to draw a reasonable inference that Gershen was in any way personally interested in the Board's decision to adopt the Plan of Dissolution. Having determined that Gershen was not subject to a disqualifying conflict of interest, it follows that Huff Energy's argument that Gershen's alleged animosity "infected the other [Director] Defendants, who [had] also developed a pattern of animosity in their course of dealings with [Huff Energy] and its Board designees" would also ring hollow.[57]

Finally, apart from Huff Energy's conclusory allegation that Gershen's interest "infected" the remaining Director Defendants, the Complaint makes no loyalty allegations with respect to any of the four remaining Director Defendants. Therefore, even accepting Huff Energy's allegations regarding Gershen's interest

---

[56] Pl.'s Answering Br. 49 n.39.

[57] *Id.* 42.

33

as true, a majority of the indisputably independent and disinterested Board members properly approved the Plan of Dissolution.

To rebut the business judgment rule, Huff Energy must allege facts allowing for a reasonable inference that a majority of the Board acted in the midst of a disqualifying conflict of interest with respect to the decision to adopt the Plan of Dissolution.[58] It has failed to do so, and for that reason, the business judgment rule shields the Board from allegations other than waste.

While not explicitly alleging that the Board's adoption of the Plan of Dissolution amounts to waste, Huff Energy does argue that because the approved transaction resulted in no immediate distribution to Longview's stockholders, the Plan of Dissolution was "no longer advisable or indeed rational."[59] To the extent this conclusory argument in the Answering Brief is intended as a substitute for well-pled allegations of waste, it is rejected as inadequate. The Plan of Dissolution was adopted in the first instance at the urging of Huff Energy in connection with the first proposed sale of the California Assets. The Board determined to maintain that deal structure when it agreed to sell the California Assets in 2015. At the risk of repeating what has already been repeated, Huff Energy is not challenging the sale of the California Assets. In any event, the allegations that the Plan of

---

[58] *Orman*, 794 A.2d at 24.

[59] Pl.'s Answering Br. 41.

Dissolution eliminated the chance of an illusory tender offer from Huff Energy, rendered Longview's remaining assets less marketable, and rendered Longview shares less transferable are conclusory and fall well short of pleading that the Plan of Dissolution lacked "any rational business purpose."[60]

The Complaint fails to plead facts from which I may reasonably infer that the entire fairness standard of review applies to the Board's adoption of the Plan of Dissolution. I suspect this holding will come as no surprise to Huff Energy. As its arguments evolved in the course of briefing and arguing the motion to dismiss, it became clear that Huff Energy's focus had turned to its *Revlon* and *Unocal* claims. I address those claims next.[61]

### 2. *Revlon* Does Not Apply

*Revlon* enhanced scrutiny applies to "final stage" transactions, including a "cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights."[62] Inherent in such situations, even absent allegations challenging a board's interestedness or independence, "are subtle structural and

---

[60] *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 590 (Del. Ch. 2015).

[61] Because I conclude that neither *Revlon* nor *Unocal* apply here, I need not address the Defendants' argument that *Revlon* and *Unocal* claims are "not tools designed with post-closing money damages in mind . . . ." *Corwin v. KKR Fin. Hldgs. LLC.*, 126 A.3d 304, 312 (Del. 2015).

[62] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010); *accord Mendel v. Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994).

situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference."[63] Therefore, where *Revlon* concerns are present, "the defendant fiduciaries bear the burden of proving that they 'act[ed] reasonably to seek the transaction offering the best value reasonably available to the stockholders,' which could be remaining independent and not engaging in any transaction at all."[64] Indeed, "directors are generally free to select the path to value maximization,"[65] so long as that path, and the decisions made along the way, "on balance, [fall] within a range of reasonableness."[66]

The Board's adoption of the Plan of Dissolution in no way implicates the policy concerns expressed in *Revlon* that trigger this Court's enhanced scrutiny. Huff Energy argues that the Plan of Dissolution constitutes a "'final stage' transaction."[67] To the contrary, following board and stockholder approval of a plan of dissolution and the filing of a certificate of dissolution, a corporation's "existence continues for a period of three years 'or for such longer period as the

---

[63] *In re Rural Metro Corp.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

[64] *Id.* at 83 (alteration in original).

[65] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595 (Del. Ch. 2010).

[66] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

[67] Pl.'s Answering Br. 46.

Court of Chancery shall in its discretion direct' for the purpose of prosecuting and defending suits and to enable the corporation gradually to sell its properties and to wind up its affairs and discharge its liabilities."[68] As such, "the formal act of dissolution does not disturb the directors' authority to determine the means by which winding up is to be accomplished," and the directors of a dissolved corporation have "as much authority after dissolution as they had before dissolution."[69] Consequently, "[o]nce a corporation dissolves, . . . fiduciary obligations [are] imposed on its director[s] . . . not only to the former stockholders of the corporation, but also to the creditors of the corporation."[70]

Therefore, while the Board's adoption of the Plan of Dissolution began the winding up process, the Board maintained control over Longview's non-California Assets and retained its duty to act in the best interests of Longview's stockholders and creditors. For that reason, I cannot accept Huff Energy's argument that the Board's adoption of the Plan of Dissolution constituted a "final stage" transaction or implicated *Revlon* concerns—*i.e.*, "the potential conflicts of interest that fiduciaries face when considering whether to sell the corporation, to whom, and on

---

[68] 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 10.16 (2016 Supp.).

[69] *Lone Star Indus., Inc. v. Redwine*, 757 F.2d 1544, 1550, n.7 (5th Cir. 1985).

[70] *Gans v. MDR Liquidating Corp.*, 1990 WL 2851, at *9 (Del. Ch. Jan. 10, 1990).

what terms"[71]—to the same extent as a "cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights."[72]

Nor did the Plan of Dissolution effect a "change of control."[73]  The best Huff Energy can muster on this front is that Longview agreed to pay Gershen, Pearce and others "'change of control' payments based on the Dissolution."[74]  Of course, the Complaint acknowledges and pleads that the "change of control" payments were actually triggered by the sale of the California Assets, not the Dissolution.[75]  No well pled facts allow an inference that the Plan of Dissolution effected a change of control.  *Revlon* does not apply.

### 3.  *Unocal* Does Not Apply

As an alternative (or perhaps accent) to its *Revlon* argument, Huff Energy contends that the Plan of Dissolution invokes *Unocal* enhanced scrutiny because it was adopted as "an unreasonable poison pill."[76]  "The Delaware Supreme Court created the intermediate standard of review in its iconic *Unocal* decision, which declined to apply either the business judgment rule or the entire fairness test to

---

[71] *Rural Metro*, 88 A.3d at 82–83.

[72] *Lonergan*, 5 A.3d at 1019.

[73] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009).

[74] Pl.'s Answering Br. 45.

[75] Compl. ¶¶ 31, 74–75.

[76] Compl. ¶ 93.

actions taken by directors to resist a hostile takeover."[77] In *Unocal*, the Court

recognized that "[w]hen a board addresses a pending takeover bid," there is an

"omnipresent specter that a board may be acting primarily in its own interests,

rather than those of the corporation and its shareholders."[78] Thus, notwithstanding

the absence of allegations that the board or board members were motivated by

conflicts of interest, this Court recognizes that in the context of a board's resistance

to a hostile offer, a level of scrutiny more exacting than the business judgment rule

but less rigorous than entire fairness is necessary to protect stockholders from

entrenchment concerns inherent in such circumstances.[79]

Huff Energy argues that the Board's adoption of the Plan of Dissolution

implicates *Unocal* entrenchment concerns because it constituted a "defensive

measure[] in response to a perceived threat to corporate policy that 'touche[d] upon

issues of control.'"[80] The Complaint's only allegations supporting this contention,

however, are (1) that the Plan of Dissolution was designed to "wrest any control

from Plaintiff and its Board designees over a sale of the Company," and (2) that

Gershen and the other Director Defendants perceived Huff Energy "as a threat to

---

[77] *Rural Metro*, 88 A.3d at 82.

[78] *Unocal*, 493 A.2d at 954.

[79] *See Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

[80] Pl.'s Answering Br. 48 (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995)).

[Gershen's] power over Longview."[81]  Huff Energy cites no cases, however, indicating either that (1) the adoption or filing of a certificate of dissolution or (2) the board's "perception" that a shareholder posed a threat to any individual director's "power" over the corporation implicates the "omnipresent specter" lingering in those instances where *Unocal* scrutiny has been invoked.[82]  Indeed, the adoption and filing of a certificate of dissolution avoids any specter of entrenchment given that such action invariably results in winding up of the company's operations, payments of its debts and liquidation of its assets.  Not only did the Board not adopt a defensive measure in the *Unocal* sense or otherwise, it faced no cognizable threat that would have motivated it to do so (for entrenchment purposes or any other purpose for that matter).[83]

---

[81] *Id.* 48–49.  In fact, the Complaint refers only to a "potential tender offer" that Huff Energy "might have made" for the remaining Longview shares.  Compl. ¶ 77.  It contains no allegations that any such offer was forthcoming or, more importantly, that the Board knew a tender offer was in the works.

[82] *Kahn ex rel. DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 466 (Del. 1996) (finding that "the factual circumstances do not warrant the application of *Unocal*" because "[n]othing in the record indicates that there was a real probability of any hostile acquir[er] emerging or that the corporation was 'in play'").

[83] Even if the Plan of Dissolution was to be characterized as a "defensive measure," in the absence of a real or perceived threat, its adoption likely would be subject to business judgment review.  *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1079 (Del. Ch.), *aff'd*, 500 A.2d 1346 (Del. 1985); *Goggin v. Vermillion, Inc.*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011); *eBay Domestic Hldgs, Inc. v. Newmark*, 16 A.3d 1, 27–28 (Del. Ch. 2010).

## 4. The Cleansing Effect of the Longview Stockholders' Vote

Even if the Court agreed with Huff Energy that it has pled facts that would allow an inference that the Board's adoption of the Plan of Dissolution invoked some form of enhanced scrutiny, the Longview stockholders' approval cleansed the transaction thereby irrebuttably reinstating the business judgment rule. As recently reiterated by our Supreme Court in *Corwin v. KKR Financial Holdings LLC*,[84] "Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines that a transaction with a party other than a controlling stockholder is in their best interests."[85]

Huff Energy attempts to circumvent *Corwin*'s cleansing effect by contending that the Longview stockholders' vote was not fully informed. To succeed on this argument, Huff Energy must plead facts from which the Court may reasonably infer that the Proxy Statement omitted material information, that is, information that, if disclosed, had a "substantial likelihood" of being "viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available."[86] Huff Energy's only allegation to that end,

---

[84] 125 A.3d 304 (Del. 2015).

[85] *Id.* at 306–08 (holding that business judgment rule applies when a transaction is approved by a fully informed and uncoerced vote of disinterested stockholders).

[86] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000). *See also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) ("An omitted fact is material if there is a

however, is that the Proxy Statement failed to disclose that D'Angelo, the only Huff Energy-appointed director present during the Board's approval of the Plan of Dissolution, abstained from the vote and the reason(s) for his abstention.[87] The argument is essentially that the Proxy Statement's disclosure that "the Board" recommended the Plan of Dissolution misleadingly suggests that the vote to approve the Plan of Dissolution was unanimous when, in fact, one director abstained.

With respect to Huff Energy's concerns that the Proxy Statement omitted the rationale underlying D'Angelo's abstention, Delaware law is clear that while "all material *facts* must be disclosed . . . individual directors need not state 'the grounds of their judgment for or against a proposed shareholder action.'"[88] With respect to the abstention itself, my determination that the adoption of the Plan of Dissolution did not require unanimous Board approval dispenses with any argument that it is "[substantially likely] that a reasonable shareholder would consider" a disclosure

---

substantial likelihood that a reasonable shareholder would consider it important in deciding [whether to approve the challenged transaction]") (citations omitted).

[87] Pl.'s Answering Br. 51–52.

[88] *Dias v. Purches*, 2012 WL 4503174, at *9 (Del. Ch. Oct. 1, 2012) (quoting *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. 2011)).

that D'Angelo's abstained from voting to be "important in deciding" whether to vote to approve the plan.[89]

To the extent Huff Energy argues, separate and apart from its unanimity argument, that the omission of a disclosure that D'Angelo abstained materially misled the stockholders because the Proxy Statement's "generalized use of the term 'Board' in the Proxy Statement . . . indicates that the full Board [was] in support of"[90] the Plan of Dissolution, I must again disagree. Neither party cited a case, and I am aware of none, that stands for the proposition that a proxy statement's omission of the fact that a board's approval of a transaction was other than unanimous, much less that the only dissent was one director's abstention, is a material omission. I can discern no basis to set that precedent.

Having determined that Huff Energy has failed to plead that the stockholder vote was uninformed, absent any allegations regarding potential interestedness or coercion of Longview's stockholders, *Corwin* and its progeny provide that, even if the Court determined that *Revlon* or *Unocal* enhanced scrutiny might otherwise apply, given the cleansing vote of the stockholders, "the business judgment rule irrebuttably applies" to the Board's adoption of the Plan of Dissolution.[91] And

---

[89] *Rosenblatt,* 493 A.2d at 944.

[90] Pl.'s Answering Br. 52.

[91] *In re Volcano Corp. S'holder Litig.*, 2016 WL 3626521, at *9 (Del. Ch. June 30, 2016). *See also Singh v. Attenborough*, 137A.3d 151 (Del. 2016) (holding that "a fully informed

43

having determined that the Complaint fails to state a claim for waste, Huff Energy has no remaining ground on which to stake a breach of fiduciary duty claim.[92]

## III.  CONCLUSION

For the reasons stated above, the Board's approval of the Plan of Dissolution and subsequent filing of a certificate of dissolution in no way violated the Shareholders Agreement or the Director Defendants' fiduciary duties. Accordingly, Defendants' Motion to Dismiss must be granted in full.

**IT IS SO ORDERED.**

---

uncoerced vote of the disinterested stockholders invoke the business judgment standard of review" and noting that "[w]hen the business judgment standard of review is involved because of a vote, dismissal is typically the result").

[92] *Id.*